HONORABLE TANA LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PAUL BERNAL and JACK COE, individuals, | NO.  2:22-CV-00533-TL |
| Plaintiffs, | |
| vs. | FIRST AMENDED COMPLAINT FOR DAMAGES |
| THE BOEING COMPANY, | |
| Defendant. | |

## I.    VENUE AND JURISDICTION

1.    The above-entitled court has jurisdiction over the subject matter of this action

pursuant to RCW 2.08.010;

2.    This Court is the proper venue for this action as plaintiffs, Paul Bernal and Jack Coe,

were employed by the defendant, The Boeing Company, in King County,

Washington;

## II.    FACTUAL ALLEGATIONS

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 1

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

**PAUL BERNAL:**

1.       Bernal was hired by Boeing in 1989 as an Industrial Engineer.  Until the events of this case, Bernal enjoyed consistent positive performance reviews, pay raises, and bonuses.  Bernal was also repeatedly promoted, including a 2011 promotion to an M Level management position as a Sr. Manager for the Boeing Intellectual Property Licensing Company ("BIPLC").  In that position, Bernal reported to Luis Valdez, the Director of BIPLC.  In 2013, Valdez was replaced by Rick Svoboda;

2.       In 2013, BIPLC reorganized, and Bernal was made the Senior Manager of its new Global Patent and Technology Team ("GP&T").  In that position, Bernal continued to directly report to Svoboda;

3.       In 2014, Svoboda hired Linda Beltz as the Senior Manager of BIPLC's Commercial Aviation Licensing team (which eventually became the Commercial Aerospace Licensing, or "CAL" team).  In that position, Beltz was a peer of Bernal and a direct report to Svoboda;

4.       As the CAL manager, Beltz developed a reputation for creating and fostering a hostile work environment for BIPLC's most senior employees by directly and indirectly targeting them for heightened scrutiny of their work performance, heightened surveillance, disparate discipline, and persistent, humiliating, and degrading comments related to their work, writing abilities, and dress;

5.       In 2016, Beltz's CAL licensing team was reorganized into smaller teams designated "North America Licensing" and "International Licensing."  To manage the North America team, Beltz promoted Alexi Naimushin, who had only joined BIPLC in

2014.  To manage the International team, Beltz brought in Denise Steensland from another Boeing department.  Beltz and Steensland had previously worked together on a contracting project.  Both Naimushin and Steensland reported directly to Beltz;

6.     Following the hiring of Naimushin and Steensland, the environment for older workers within Beltz's CAL team worsened.  On Steensland's team alone, within eighteen months every older worker on her team had been driven out, fired, or taken a medical leave of absence.  Each of those employees was replaced by an employee in their 20's and 30's;

7.     In addition, Naimushin confided in several coworkers that Beltz was consistently pressuring him to take the same type of targeted actions towards his senior employees as Steensland had taken towards the senior employees on her team;

8.     As the conditions worsened, CAL's older employees started to file complaints with Boeing's Human Resources and Ethics departments alleging an age based hostile work environment;

9.     Svoboda was well aware of these complaints, and on many occasions discussed them with a few of his senior staff, including Bernal.  As Bernal heard increasing complaints from older CAL team members about their hostile work environment, he told Svoboda that it appeared Beltz was targeting Svoboda's "most seasoned workers," and "a certain demographic."  Svoboda never disputed Bernal's description of the employees being targeted by Beltz;

10.    Instead, Svoboda initially defended Beltz's conduct, telling Bernal that she was only targeting "dead wood."  Eventually, however, as the atmosphere in BIPLC

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 3

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

worsened, Svoboda vacillated in his comments to Bernal.  At times Svoboda would lament that Beltz was the worst hire he had ever made and that he needed to get her managing a smaller group or out of management entirely.  At other times, Svoboda would simply claim that he was "working with her;"

11.     In March 2018, an employee who had been targeted and fired by Beltz and Steensland filed a discrimination lawsuit alleging he had been targeted for heighted scrutiny, discipline, and termination as a result of his age.  This information soon became known among BIPLC employees, including Bernal;

12.     The following month, in April 2018, Svoboda and Bernal agreed that Bernal would take over management of Beltz's CAL team, and that she would be placed elsewhere in the organization;

13.     After Svoboda informed Beltz of his decision to take away her team, she was observed repeatedly visiting his office and heard yelling and crying.  After this, Svoboda changed his mind and allowed Beltz to retain the CAL team;

14.     When employees learned that Beltz would continue to manage the CAL team, some of the remaining older targeted employees came to Bernal to express their disappointment and fear for their mental health and jobs;

15.     Naimushin was also greatly impacted.  He reported to Bernal that pressure from Beltz to target his older employees was causing him to be physically ill with stress.  Eventually, Naimushin took a medical leave of absence.  To fill in for Naimushin while he was on leave, Beltz elevated an employee in his 30's who had only joined CAL the previous year;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 4

BOYLE MARTIN THOENY, PLLC
100 West Harrison, South Tower, Ste. 300
Seattle, Washington 98119
Telephone: 206.217.9400
Facsimile: 206.217.9600

16. In June 2018, Svoboda asked Bernal to step away from managing the GP&T team and become the Senior Manager of the new BIPLC Enforcement Team.  In that role Bernal would be responsible for developing the team, its scope of work, and how that work would be accomplished;

17. This was not the first time Svoboda had asked Bernal to lead a new team concept.  In 2016, Svoboda had asked Bernal to weave into his GP&T team a new approach to "Non-core Business Development."  Bernal did so successfully, and his team was still doing that work in 2018 when Svoboda asked him to take on the new Enforcement Team;

18. Bernal was candid in telling Svoboda that he was not excited about and reluctant to start-up and lead a new team performing Enforcement activities.  Yet, Svoboda persisted in his request, at one point telling Bernal that he was the best manager to take on the task, and that he trusted Bernal to do it well.  Bernal eventually agreed, telling Svoboda that although he wasn't excited about the position, as a loyal Boeing employee and a professional, he would give the work "100 percent" and "knock it out of the park;"

19. Bernal immediately embraced the task of building the Enforcement team.  Within two weeks he had identified and was getting advice from subject matter experts as he worked to develop the Enforcement Team's mission, goals, and organizational structure.  Bernal had also created a draft organizational chart with potential staff, and was starting to reach out to those people to determine their interest in joining the new team;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 5

20.     Bernal was also working with Deb Binford, a Boeing Organizational Development representative, to organize a multi-day workshop for the Enforcement team.  The workshop would be attended by Svoboda, whom Bernal had asked to give a presentation;

21.     Then, during a meeting on July 19, 2018, Svoboda informed Bernal that he and his Enforcement team would be required to work closely with Beltz.  Bernal was taken aback by this disclosure.  Beltz was continuing to target older workers for harassment, and Bernal and many incoming members of his new team were older employees.  Bernal immediately told Svoboda that he would not tolerate Beltz's targeting and if she engaged in any of that behavior towards him or his team members he would go straight to HR;

22.     Bernal's statement angered Svoboda.  In a raised voice, Svoboda abruptly and sternly instructed Bernal "you can't do that, you only go to me, you only tell me.  I am coaching her, I am mentoring her, I am working with her;"

23.     Bernal did not back down, and told Svoboda "No Rick, I will go to HR and inform you after the fact."  Svoboda then abruptly ended the meeting;

24.     The following day, on July 20th, Pete Hoffman, the Vice President of Boeing Intellectual Property Management ("IPM"), introduced Bernal as the Senior Manager of the new Enforcement Team during an IPM "All Hands Meeting" – a meeting attended by over a hundred employees.  In making the announcement, Hoffman praised Bernal as being "uniquely qualified" to lead the Enforcement team start-up, and said that he was grateful Bernal had agreed to do so;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 6

25.    Yet, following Bernal's HR warning to Svoboda on July 19th, his relationship with Svoboda was never the same;

26.    Bernal and Svoboda had offices that were in close proximity, and Bernal's office was between Svoboda's and the coffee station.  As a result, the two would see each other at least daily as Svoboda went for coffee.  At least once a week, Svoboda would stop at Bernal's office door to say hello.  Following their meeting on July 19th, Svoboda stopped having any interaction with Bernal that was not required, and even started to take a different route to get coffee.  Bernal was concerned because he believed Svoboda was angry and purposely avoiding him because of his HR warning;

27.    Meanwhile, Bernal continued to solidify the Enforcement team membership, and its mission, goals, and organizational structure.  He also finished organizing the Enforcement team workshop that was now scheduled for the second week of August – less than six weeks from when he agreed to take on the Enforcement team;

28.    Yet, by the time that workshop took place, Bernal was no longer the manager of the Enforcement Team;

29.    A few days before the Workshop was to take place, and two weeks after Bernal told Svoboda that he would not tolerate Beltz's targeting of older workers, Svoboda called Bernal and abruptly removed him from the Enforcement position, effective immediately.  Svoboda told Bernal that he could not have a "disgruntled" employee leading the new enforcement effort.  Svoboda had not previously discussed with Bernal any concern about his attitude, or that he felt Bernal was "disgruntled."  A

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 7

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

stunned Bernal denied being disgruntled and reminded Svoboda of all the work he had done in the short time since taking on the Enforcement role;

30.    Svoboda, however, wasn't done.  Svoboda also told Bernal – an employee with a stellar, 15-year career in Boeing management – that he had until the end of the year to find another management position at Boeing or Svoboda would demote him out of management.  At that point, the call ended;

31.    Bernal returned to his GP&T manager position, and Svoboda immediately replaced him in the Enforcement positon with Angela Smith, a Patent Portfolio Management employee who had not previously expressed any interest in moving to licensing, much less in taking on the new Enforcement team;

32.    A few days later, the Workshop developed and organized by Bernal took place, and by all accounts was a success.  Later, during a BIPLC-wide staff meeting involving more than 60 people across the nation, Svoboda singled out for praise each individual who had a role in the Workshop—except Bernal.  The public omission was glaring and embarrassing.  Bernal felt Svoboda had intentionally marginalized him by completely ignoring the hard work he was known by many at that meeting to have put in on the workshop;

33.    After Bernal's return to his GP&T position, Svoboda started engaging in conduct he knew would frustrate and hamper the ability of Bernal's team to perform its scope of work.  Without prior discussion with Bernal, and contrary to typical practice, Svoboda reassigned two of Bernal's team members to other BIPLC groups.  He also started to limit necessary travel approval for GP&T members.  When a significant

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 8

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

GP&T project that had been progressing normally suddenly stalled and was in limbo, Svoboda gave varying excuses for the delay.  Bernal was stressed and humiliated by these actions as he believed Svoboda intended to and was undermining his ability to successfully run his GP&T team and damaging his authority as its manager;

34.   In October 2018, two months after filling the position, Angela Smith resigned as manager of the Enforcement team.  Her departure left the management position vacant;

35.   While handling his GP&T management duties, Bernal had also been looking for new positions.  In a later meeting with Svoboda, Bernal was told that if he did not find a management position outside BIPLC, he would likely be placed in a position under Kim Johnson – one of Bernal's management peers.  Bernal asked about returning to either the now vacant Enforcement position, or one of the two other vacant management positions within the organization.  Svoboda told Bernal that his "style" of management was no longer needed in BIPLC, and instead Svoboda wanted "drivers, like Linda."  While seemingly chuckling, Svoboda did say that Bernal could always apply for the open positions "and we will just see what happens."  Bernal did not apply for the positions because he believed it would be pointless;

36.   In November 2018, Bernal attended a meeting with other managers to discuss year end employee performance reviews.  During the meeting, Beltz was asked to identify her team members who she viewed to be only "moderately effective."  Every employee Beltz identified was over 50 years of age, some of whom had previously

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

been on Bernal's team and he knew to be reliable performers;

37.   Also in November, the older employee on Steensland's team who had been out on extended leave returned to work.  The employee had been told that Boeing HR had found insufficient evidence to support his hostile work environment claim.  Yet, without explanation, Boeing transferred the employee out of Beltz's CAL team and reassigned him to another manager;

38.   In December 2018, Svoboda interviewed a GP&T team member for a possible transfer to another BIPLC position.  This was unusual because Svoboda had not previously discussed with Bernal that he was exploring such a transfer, much less that he had a member he wanted to interview for that purpose.  Bernal was surprised and embarrassed when informed of the interview by the team member – who herself felt blind-sided and upset by Svoboda's conduct.  Bernal again felt that Svoboda intended to, and Bernal did feel, humiliated and demeaned by exclusion from the interview;

39.   Also in December, Bernal received his 2018 performance review from Svoboda.  In previous years, Bernal had consistently received an annual rating of a ".95."  Since he had "met" or "exceeded" every performance metric during 2018, he expected to receive a similar rating.  Yet, despite Bernal's metric results, Svoboda gave Bernal a rating of ".85" – a rating so low that Bernal understood it usually resulted in the employee being placed on a Performance Improvement Plan ("PIP").  In addition, a rating of .85 would effectively gut Bernal's search for another management position within Boeing.  Bernal was highly stressed by the rating, and he anticipated being

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 10

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

placed on a PIP;

40.   Bernal provided a written response to his performance review.  In that response, Bernal described the July meeting during which he told Svoboda that he would not tolerate Beltz treating his older team members as she had her own, and Svoboda's swift threat to remove him from the Enforcement Team and threaten removal from BIPLC management;

41.   By January 2019, despite a diligent search and his stellar resume, consistently positive performance reviews, bonuses, and promotion, Bernal was unable to find another Boeing management position.  During his search, Bernal experienced calls that were no longer returned, leads that turned into dead ends, and formerly friendly management peers who were now standoffish;

42.   While Bernal remained in his GP&T management position Svoboda continued to engage in conduct that Bernal found humiliating and stressful, and which Bernal believed damaged his managerial authority and reputation;

43.   In January, again without any prior discussion with Bernal, Svoboda transferred another GP&T employee off Bernal's team.  Bernal also learned from a different GP&T team member that Svoboda had breached typical protocol by directly instructing the team member to engage with a high profile client;

44.   Despite Svoboda's demeaning treatment of Bernal, and his meddling interference with the GP&T team and its work, Bernal and his team continued to work on important goals and have notable successes.  In late January 2019, after Bernal and the GP&T team had successfully completed a significant Boeing agreement, Pete

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

Hoffman, the VP of IPM, singled them out for praise during a meeting for the entire national IPM Group;

45.     Meanwhile, Boeing Human Resources were investigating multiple complaints from employees managed by Beltz and Steensland, including the complaint filed by Naimushin on behalf of the older workers on his team.  The atmosphere in CAL was described by employees as being "toxic;"

46.     On February 28, 2019, Hoffman unexpectedly scheduled an immediate IPM "All-Managers" telephone conference.  On the call, Hoffman announced the surprise retirement of Svoboda, effective May 2, 2019.  Svoboda did not take the meeting in the conference room with Bernal and the other managers, but instead stayed in his office;

47.     The following month, in a meeting with Bernal, Svoboda dismissively asked him "what do you do around here?"  Svoboda had no legitimate reason to ask this question as he was well aware of Bernal's heavy workload.  Yet, Svoboda also knew that Bernal takes great pride in his work ethic and professionalism.  Bernal took Svoboda's comment as one intended to be hurtful and demeaning – which, to Bernal it was;

48.     On April 8, 2019, Bernal met with Svoboda for their monthly 1:1 meeting.  Svoboda informed Bernal that on April 19th he would not only be drastically demoted to an IP Licensing Specialist position, but that he would be directly reporting to none other than Beltz.  Svoboda also told Bernal that he had 10 days to accept the transfer or he would be terminated;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 12

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

49.    On April 10, 2019, Bernal received a letter from a Boeing recruiter informing him that Boeing had determined that either he or his position – the letter did not make this clear – was "surplus."  Bernal was confused by this information.  He was familiar with the surplus process having been through it once before as a manager in 2006 when his then management position was deemed surplus and he was reassigned to a different management position.  From that experience, Bernal believed a surplus decision resulted after input from multiple Boeing departments, as opposed to the desires of an individual manager, like Svoboda.  Regarding the current surplus decision, Bernal had no information regarding who made that decision or when, the departments that provided input, or the factors upon which the decision was based;

50.    In the same letter, Boeing then makes Bernal a tentative "offer" for an "equivalent redeployment reassignment" to an IP Licensing Specialist position in which he would keep his same level of pay and be supervised by Svoboda;

51.    The letter specifies that Boeing's offer was tentative because it had not yet made a final determination that Bernal was eligible for the Licensing position.  In the event Boeing determined that Bernal was not eligible for that position, the tentative offer would become "null and void;"

52.    The letter did not inform Bernal what action Boeing would take regarding his employment in the event the tentative reassignment offer was withdrawn.  Based upon his previous experience, Bernal believed that Boeing would continue to look for suitable positions for which he was qualified, including other management positions;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 13

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

53.     On April 12, 2019, Bernal received another letter from the same Boeing recruiter. This letter was identical to the one Bernal received on April 10th with one exception: the tentatively offered reassignment position would be supervised by Beltz rather than Svoboda;

54.     On April 18, 2019, Bernal was informed that the reassignment offer was no longer tentative and the reassignment would go forward.  Svoboda sent out an email later that day informing the IPM groups of the upcoming change.  Bernal was not told, and he does not know when Boeing made the determination he was eligible for the Licensing position, or who made that decision;

55.     Bernal believes that Svoboda improperly influenced and used the reassignment process so that it resulted in Boeing making a decision to place him in the humiliating and predictably, continuing hostile environment that Svoboda wanted him in: a non-management level position, and one supervised by Beltz;

56.     As the reassignment resulted in Bernal staying within BIPLC, he also believes that Svoboda had the discretion to place him on a BIPLC team not under Beltz's supervision but chose not to do so.  As a result, even if Svoboda had not acted to improperly influence the reassignment process, Bernal believes that Svoboda left him on Beltz's team for the same reasons;

57.     Bernal had never worked as a Licensing Specialist, but upon his transfer to Beltz's group he was provided with no organized training on any aspect of the job, much less training on the computer programs necessary to do it.  Instead, Bernal was required to impose on coworkers, some of whom he had previously managed, to

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 14

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

learn how to do the job;

58. Bernal, who now worked in a cubicle as opposed to having his own office, was assigned a desk behind a row of cubes which employees on Beltz's team referred to as "the Green Mile."  The name was coined because of the employees who had or were occupying the cubicles on that row: older members of Beltz's team who were either experiencing harassment, or had left Boeing voluntarily or involuntarily because of the hostile work environment and discrimination they experienced;

59. Bernal was also told that he would be subject to the 6-month remote work restrictions that apply to new, probationary Boeing employees, but that Svoboda would allow the restriction to be revisited in a few months.  Bernal believed the only reason Svoboda and Beltz applied the probationary policy was to further humiliate him, which it did;

60. Bernal then filed his own EEO complaint alleging retaliation for his statement to Svoboda that he would not tolerate Beltz's targeting conduct.  Less than two months later, after none of his witnesses were interviewed, Boeing EEO told Bernal that his complaint was being closed because there was no evidence to support his claims;

61. Meanwhile, Beltz was doing what she could to pressure Bernal to withdraw from his long-time Boeing volunteer roles that were unrelated to his former management position;

62. Bernal was a leader in Boeing's Diversity program and also an advisor and mentor for the group "Boeing Women Inspiring Leadership" ("BWIL").  Beltz informed Bernal that the statement of work she planned on assigning him would prevent him

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 15

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1
2
3
4

from continuing his volunteer roles.  When Bernal said he was confident he could continue to meet workload demands while continuing his volunteer work, Beltz took away the small budget Bernal had previously been provided for expenses related to that work;

5
6
7
8
9
10
11

63.  Beltz then furthered her demands that Bernal withdraw from his Diversity roles by getting the new BIPLC Director, Coleen Burke-Finney, involved.  When Burke-Finney raised the issue with Bernal, she repeated Beltz's earlier comments.  Bernal felt compelled by the pressure to agree to limit his volunteer work.  He resigned as a formal advisor to BWIL and informed the group that he would not take on any new mentees;

12
13
14
15
16

64.  Bernal did, however, continue to honor his existing mentoring relationships.  In response, Beltz demanded that he provide her full access to his calendar as well as the names of the women he was mentoring, and the locations of where he met with them;

17
18
19
20
21

65.  Bernal believed Beltz knew that he greatly enjoyed his volunteer roles and that it allowed him to work with Boeing executives and other high level managers.  By demanding that he withdraw from those roles, Bernal further believed that Beltz was trying to undermine the positive enjoyment and connections that came from his volunteer work;

22
23
24
25

66.  When making her continued demands that Bernal lessen his volunteer work, Beltz never told Bernal that she had found his performance lacking, and in fact, Bernal excelled at his work;

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 16

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

67.     During this time, Beltz had assigned to Bernal the task of writing BIPLC's applications for release of Boeing proprietary materials.  Such applications, called Release of Boeing Proprietary Information ("RBPI"), were complex and had to gain multiple approvals before BIPLC could utilize them.  Beltz had long been responsible for the task, and although obtaining RBPI approval was notoriously difficult, only two had previously been approved.  When she assigned the work to Bernal, Beltz knew the difficulty and size of the task, but gave Bernal 10 weeks to complete the project;

68.     While also performing his other duties, and to the amazement of his peers, Bernal created and gained approval for the majority of the necessary RBPI by the deadline. He requested a brief extension of that deadline to complete the project, which Beltz approved.  Bernal completed his work by that deadline;

69.     Beltz downplayed Bernal's RBPI accomplishment, even to the point of mocking him.  During a staff meeting, Beltz gave minimal recognition to Bernal's RBPI successes, and later "awarded" him with 3 tokens for free ice creams at the Boeing cafeteria.  Bernal was embarrassed and humiliated by what he perceived was Beltz's effort to diminish his work.  By contrast, at this same time the promotion efforts of another BIPLC manager had resulted in corporate accolades for one of her team members who had used Bernal's RBPI template to get approval of one RBPI;

70.     When Beltz provided Bernal with his first performance review under her management, she cited his failure to meet the original RBPI deadline as a performance deficiency.  When Bernal reminded her that she had approved an

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 17

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

extension of the deadline, Beltz denied having done so, and would intimate in the final version of Bernal's performance review that he had misrepresented the deadline;

71.   Within a few months, Boeing shut down in-person operations due to the COVID pandemic.  As a result, Bernal's interactions with Beltz were limited to bi-monthly 1:1 telephone calls and monthly group video conference meetings.  Beltz was often late joining her 1:1 calls with Bernal, and during those calls she regularly seemed to be distracted or doing something else during the call, like making lunch or eating. While Bernal was relieved to have the limited interaction with Beltz that came with remote work, her attitude made him feel disrespected and that his work was unimportant;

72.   As a result of the above described events and environment, Bernal suffered and continues to suffer significant economic damages, and emotional and physical distress including humiliation, embarrassment, anger, depression, sleep loss, eye spasms, and loss of confidence.  While Bernal no longer suffers all, or a combination of these symptoms on a daily basis, he continues to struggle with the emotional impact of the events that followed his comments to Svoboda on July 19, 2018 that he would not tolerate Beltz extending her targeted harassment of older workers to him and his older team members, and if any such harassment occurred, he would go directly to HR;

**JACK COE:**

73.   Coe graduated from law school in 1981, and started work at a large private firm in

Houston, Texas;

74. After several years of private practice, Coe accepted a position with KBR, Inc. (at the time, Brown & Root, Inc.), a global engineering and construction firm.  In his role, Coe handled domestic and international contractual responsibilities (drafting, negotiations, and implementation), managed litigation and dispute resolution, and eventually, supervised staff in each of these areas;

75. In 1987, Coe was hired by Baker Hughes, Inc., a Fortune 200 company and one of the world's largest oil field services providers.  Coe was quickly promoted from corporate counsel to Vice President and General Counsel.  In his VP/GC position, Coe managed domestic and international contracts, litigation, and oversaw oilfield operations, including risk management and regulatory compliance issues.  Coe also supervised a significant number of employees across each of these areas;

76. In 2010, Coe joined Rockwell Collins, Inc. as the portfolio contracts team leader for its Flight Information Solutions and Mobility/Rotary Wing divisions.  Later, Coe's duties grew to include working with the Intellectual Property and Advanced Technologies Group and senior corporate IP leadership to develop and implement policies and procedures to ensure Rockwell Collins' ability to analyze, capture, and protect its intellectual property value.  Coe excelled at this work, which led to Rockwell Collins promoting him to its Intellectual Property Value Capture "Team of Excellence."  In each of his roles at Rockwell Collins, Coe also managed a significant number of employees;

77. Coe's work for Rockwell Collins also allowed him to work directly with Boeing on

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

several of its largest commercial and military programs, such as the 787/777/747 and KC-46;

78.   In 2015, Coe interviewed for a position with Svoboda's BIPLC group.  Coe wanted to return to Seattle to be closer to family, and he believed Boeing represented the apex of the aerospace industry.  The position was also attractive because Coe learned there were going to be a new management position for the CAL North American Licensing team, which he was well qualified to fill;

79.   As a result, Coe accepted Svoboda's offer of a position as a Licensing Specialist on Beltz's CAL team;

80.   Yet, when the new management position was created, Beltz promoted Coe's coworker, Alexi Naimushin, into the manager position.  Although, Naimushin had joined BIPLC in 2014, he was significantly less experienced than Coe.  While disappointed, until 2020, Coe worked well with Naimushin and together they enjoyed many accomplishments;

81.   During his career at Boeing, Coe consistently and successfully handled one of the largest workloads in his group, including the accounts for some of BIPLC's largest and most critical suppliers.  Coe consistently received excellent performance reviews for his work, and in April 2019, he was the first intellectual property team member to be awarded Boeing's Excellence in Contracting Award – the company-wide award given to the employee with exemplary contracting and transactional skills, and who also exhibits each of the key "Boeing Behaviors;"

82.   During his tenure, Coe was aware of his older BIPLC coworkers being subjected to

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

heightened scrutiny and harassment by Beltz and Steensland, and also witnessed as those coworkers were either demoted or left Boeing as a result of terminations, premature retirements, and involuntary layoffs. Coe was also aware of complaints filed with Boeing's HR and Ethics departments and that at least one terminated older worker had sued Boeing alleging discrimination by Steensland. As the pattern of harassment and discrimination continued, and the number of older coworkers dwindled, Coe consistently feared that as one of the oldest remaining members of the team, he could be next;

83. In December 2019, Coe met with Naimushin to discuss his 2019 performance review. Coe again received an excellent review, as Naimushin told him that he had met or exceeded all performance metrics established for him that year. Naimushin also congratulated Coe on negotiating and concluding several lucrative and "first of their kind" deals for the CAL North America team, and again congratulated him for being awarded the 2019 Excellence in Contracting award;

84. On January 8, 2020, as Coe watched a 3-minute video from www.space.com entitled "Starliner Postmortem." The video had been forwarded to Coe by Jonathan Tomlinson, one of BIPLC's "Subject Matter Experts" in business intelligence/marketing analysis. Like many at Boeing, Tomlinson and Coe had been following Boeing's Starliner project, and Tomlinson believed the video provided a good discussion of systemic issues at Boeing that may have played a role in that project's delays;

85. Naimushin stopped by Coe's desk as he watched the video, and the two men briefly

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1
2
3

chatted about its subject matter.  Naimushin was interested in the video because he believed it was relevant to other issues Boeing was facing at the time.  He asked Coe to forward him the link – which Coe did;

4
5
6
7
8
9
10

86.    The following day, Coe was reviewing the current *Boeing News Now* ("*BNN*"), an internal Boeing publication that populates the homepage on Boeing employees' computers.  Coe always made a point of reviewing the publication because he believed it contained "corporate report-outs" curated by Senior Boeing Management intended to let Boeing employees learn and understand current company business activities, issues, and goals;

11
12
13
14
15
16
17
18
19
20
21

87.    Coe saw the current *BNN* contained a video on Boeing's very successful SLS Main Stage Completion and a review of the Boeing Behaviors that made it possible.  As Coe watched the approximately 3½ minute video, Naimushin again walked by his desk.  This time, Naimushin did not stop.  However, a short time later, Naimushin asked Coe into a meeting that turned out to be a formal disciplinary discussion regarding the videos.  Naimushin told Coe that by watching the videos he had violated the "Core Boeing Company Policies," by "wasting valuable company time" and presenting a "poor example" to his fellow employees.  Naimushin informed Coe that another "infraction" would result in additional discipline "up to and including termination;"

22
23
24
25

88.    Coe was astonished that he was being disciplined for watching the above videos. Coe and his coworkers regularly watched videos at their cubicles during work hours and breaks, whether from outside sources such as YouTube, or *BNN*, or videos they

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

were required to watch by HR or management;

89.  Coe immediately pointed out to Naimushin that the videos he was getting disciplined for watching were related to his work, and that one came from *BNN* so obviously Boeing corporate management thought employees should see it.  He also reminded Naimushin of their interaction the previous day, and Naimushin's request that Coe forward him a copy of the "Starliner Postmortem" video.  Finally, Coe raised the Boeing policy that allows him to use his computer for reasonable personal purposes. As a result, whether watching the videos was work related or not, he had not done anything inappropriate pursuant to written Boeing corporate policy;

90.  Naimushin offered no response to Coe's points, and provided no further explanation for the discipline;

91.  Coe knew from Naimushin's previous comments to him and others that Naimushin had been pressured by Beltz to impose unwarranted and disparate scrutiny and discipline on the older workers on his team.  Coe believed that he was a target of that same scrutiny and discipline;

92.  After the meeting, Coe wrote to Naimushin and Beltz requesting that the discipline be retracted.  When his request was ignored, Coe filed a complaint with Boeing's Ethics department.  In his complaint, Coe explained why he viewed Naimushin's discipline of him with suspicion, and that he believed he was now being subjected to the same harassing scrutiny that his older BIPLC coworkers had, and were experiencing;

93.  In March 2020, Boeing informed Coe that his ethics complaint alleging harassment

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 23

had been "resolved" with "no finding" of improper conduct because Naimushin and Beltz had not "formalized" the discipline.  Boeing never asked Coe about his allegation that older BIPLC employees had, and were experiencing harassment, or his belief that his recent discipline was a part of that pattern;

94.    Shortly thereafter, Coe met with Naimushin to discuss compensation for 2020. Based upon previous years, Coe expected that the results of his 2019 performance review would result in his 2020 compensation including both a pay increase, and a bonus payment of between 10-12% of his base pay.  Yet, Naimushin told Coe that he would not receive either a raise or a bonus because Beltz and Steensland had lowered some of his 2019 "subjective" review results from ratings of "Met" and "Exceeded" to the rating "Met Some."  Naimushin stated that the changes were based upon Beltz's and Steensland's assessment of Coe's 2019 performance on certain subjective "intangibles;"

95.    In May 2020, Coe was informed that he had been selected for an Involuntary Layoff. Coe was the only member of his division to be selected for layoff, and chosen despite there being several under-40 year old coworkers who had not been selected for layoff but who had been hired well after him;

96.    Coe's workload was primarily taken over by Chola Olympio, a coworker with less seniority than Coe, who was not currently on the North America licensing team, and who was also approximately 40 years of age and considerably younger;

97.    As a result of his involuntary layoff, Coe has suffered and continues to suffer significant economic, physical, and emotional damages.

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 24

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

## III.   CAUSES OF ACTION:  DISCRIMINATION AND RETALIATION PURSUANT TO RCW 49.60

**Bernal claim:**

98.    Bernal realleges all matters as set forth above;

99.    As alleged, Boeing's conduct constitutes retaliation in violation of the Washington Law against Discrimination, RCW 49.60, et. seq;

100.   Bernal further asserts that Boeing's unlawful conduct proximately caused him damages in the amount and to the extent to be proven at trial;

**Coe claims:**

101.   Coe realleges all matters as set forth above;

102.   As alleged, Boeing's conduct constitutes discrimination and retaliation in violation of the Washington Law against Discrimination, RCW 49.60, et. seq.;

103.   Coe further asserts that Boeing's unlawful conduct proximately caused him damages in the amount and to the extent to be proven at trial;

## IV.   PRAYER FOR RELIEF

WHEREFORE, Bernal and Coe pray that the court grant them the following relief;

104.   All damages to which a discrimination plaintiff is entitled, including but not limited to special, general, compensatory, reinstatement, front pay, taxes, and all other damages and remedies allowed pursuant to RCW 49.60 et seq., and case law;

105.   Attorney fees and costs allowed by law;

106.   Post judgment interest at the statutory rate; and

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 25

107.    Other relief as the Court may deem just and equitable.

DATED this 31st day of May, 2022.


BOYLE MARTIN THOENY, PLLC


s/Margaret M. Boyle

Margaret M. Boyle, WSBA#17089
Attorneys for Plaintiffs
100 W. Harrison, South Tower, Ste. 300
Seattle, Washington  98119
(206)217-9400/margaret@boylemartin.com

**FIRST AMENDED COMPLAINT**
2:22-CV-00533-TL - 26