1

HONORABLE TANA LIN

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
IN SEATTLE

7

8

| | | |
|---|---|---|
| PAUL BERNAL and JACK COE, | ) | NO.  2:22-cv-00533-TL |
| Plaintiffs, | ) | |
| vs. | ) | PLAINTIFF'S RESPONSE ON MOTION FOR SUMMARY JUDGMENT |
| THE BOEING COMPANY, | ) | |
| Defendant. | ) | |

9

10

11

12

13

14

**I.      ISSUES PRESENTED**

15

1.  Did Bernal file his retaliatory demotion claim within the statute of limitations?

16

17

2.  Has Bernal produced sufficient evidence to raise an issue of fact on his retaliatory hostile work environment claim?

18

**II.      STATEMENT OF FACTS**

19

**a.  <u>Bernal hired by Boeing and repeatedly promoted</u>.**

20

Bernal was hired by Boeing in 1989, and until the events of this case he enjoyed consistent

21

positive performance reviews, pay raises, and bonuses.  Bernal was also repeatedly promoted,

22

including into his first management position 1996, and ultimately in 2011 into an M Level

23

24

manager position (level just below Executive) with Boeing's Intellectual Property Licensing

25

Company ("BIPLC").  Declaration of Paul Bernal ("Bernal Decl."), ¶ 2.  In that position, Bernal

**BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT      No. 2:22-cv-00533-TL -** 1

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

managed teams of specialists who licensed Boeing's intellectual property ("IP") to companies around the world.  In 2013, Rick Svoboda became the Director of BIPLC, and Bernal reported directly to him.

Later in 2013, Svoboda formed a new BIPLC team to implement a risky, but potentially lucrative venture he wanted to try: licensing Boeing's IP to non-aerospace companies.  Id., at ¶ 3. Yet, this idea was not internally popular, had no model to emulate, and no predictable time table for Boeing to see a profit.  Svoboda asked Bernal if he would be willing to develop and lead the new venture, and promised if the venture failed, Bernal would always have a management position within BIPLC.  Bernal discussed his reservations with Svoboda, but eventually agreed to develop and manage the new, Global Patent and Technology ("GP&T") team.[1]  Id.

### b.  Svoboda hires Linda Beltz.

In 2014, Svoboda hired Linda Beltz to be the M Level manager of BIPLC's Commercial Aviation Licensing team ("CAL").  Id., ¶ 4. Beltz was a peer of Bernal and also directly reported to Svoboda.  Beltz developed a reputation for creating a hostile work environment for BIPLC's most senior employees (older workers in their late 40's-60's) by directly and indirectly targeting them for heightened performance scrutiny, heightened surveillance, disparate discipline, and persistent, public, humiliating, and degrading comments related to their work, writing abilities, and dress.  Id.

In 2016, Beltz hired two first-level managers who would each manage one of the two primary CAL teams: the International and North America licensing teams.  Id., ¶ 5. To manage

---

[1]  Svoboda falsely claims he "promoted" Bernal to lead GP&T.  Bernal remained at the same level, "YATF-M" (Senior Manager, M Level) he had held since 2011. Id.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 2**

1
2
3
4

International, Beltz brought in Denise Steensland whom she had previously worked with.  To manage North America, Beltz promoted Alexi Naimushin, a younger, relative newcomer to BIPLC.  Id. With the hiring of Steensland, the working conditions for the older CAL workers significantly worsened.  Id., ¶ 6.

5
6
7

Steensland gained a quick reputation for emulating Beltz's treatment of older workers, and within 18 months she had replaced every older worker on her team with employees in their 20's and 30's.  Id.  The older workers had either been fired, retired early, or taken medical leave.  Id.

8
9
10
11

Beltz's and Steensland's conduct resulted in numerous internal complaints with Boeing's EEO and Ethics departments, and one employee actually filed a lawsuit alleging discrimination (which was subsequently settled with a monetary payment to the plaintiff employee).[2]  Id., ¶ 7.

12
13
14
15
16
17

Both Svoboda and Bernal were well aware of the complaints regarding Beltz and Steensland – discussion about the disparate treatment and complaints was commonplace among BIPLC employees and managers.  One manager emailed Svoboda to inform him that the "hostile work environment" created by Beltz and Steensland had led to multiple early retirements, including hers – "it's too toxic."  Id., ¶ 8, Exhibit 1.

18
19
20
21
22
23

Svoboda and Bernal discussed the complaints on multiple occasions.  Bernal repeatedly commented that it appeared "older workers" and the "most senior workers" were being targeted.  Id., ¶ 10.  Svoboda didn't dispute Bernal's observation, but initially defended Beltz, claiming she was only targeting "dead wood."[3]  Svoboda did, though, also repeatedly say he was "working with her."  Bernal Decl., ¶ 10.

24
25

---

[2] <u>Wong v. The Boeing Company</u>, WAWD Cause No. 2:18-cv-00597-JCC, Dk. No. 1, Exhibit A, Dk. No. 27.
[3] Svoboda would later praise Beltz for "cutting a lot of deadwood" since being hired.  Declaration of Margaret Boyle ("Boyle Decl."), ¶ 2, Exhibit 1.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 3**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

In April 2018, shortly after the above referenced lawsuit was filed, Svoboda asked Bernal to take over managing Beltz's CAL team so her role could be reduced. Bernal again agreed to Svoboda's request, and Svoboda subsequently notified his boss, Pete Hoffman, of the intended change. Bernal Decl., ¶ 11; Boyle Decl., ¶ 3, Exhibit 2.

Yet, before that change was implemented, in June 2018 Svoboda asked Bernal to instead lead BIPLC's latest startup effort: an IP enforcement team. Bernal Decl., ¶ 12. In that role, Bernal would be responsible for developing the team, its scope of work, and enforcement processes – essentially the same tasks he accomplished with GP&T. Bernal candidly told Svoboda that he was not excited about leading another new team. Id. Svoboda pushed, saying that Bernal was the best manager to take on the task, and he trusted Bernal to do it well. Bernal agreed to think about it. Bernal and Svoboda next met in early July, and Bernal agreed to take on the new team, promised to give the work "100 percent" and "knock it out of the park."[4] Id.

This development was hard for both the older targeted employees on Beltz's team, as well as Naimushin, who told Bernal they feared for their mental health and jobs. Id, ¶ 14.

Bernal moved quickly once in the Enforcement position. Within weeks he had advice from experts in enforcement that he used to develop the new team's mission, goals, and organizational structure. Id., ¶ 15. He also created a organizational chart, reaching out to potential staff, and organizing a multi-day team workshop for stakeholders. Bernal kept Svoboda apprised of his progress, and also arranged for Svoboda to speak at the workshop. Id.

**Bernal engages in protected conduct:**

---

[4] Boeing incorrectly claims Bernal said he "was not interested in an enforcement job and lacked the skills to do it well." Defendant Boeing's Motion for Summary Judgment ("Boeing's Motion"), at 1:19-20.

BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT   No. 2:22-cv-00533-TL - 4

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

During a meeting on July 19, 2018, Svoboda told Bernal that he and his Enforcement team would be required to work closely with Beltz. Id., ¶ 16.  Bernal and many incoming members of his new team were older employees, and he immediately told Svoboda that he would go straight to HR if Beltz targeted him or his older team members for harassment. Id.  Svoboda became angry, and in a raised voice, he abruptly and sternly instructed Bernal "you can't do that, you only go to me, you only tell me.  I am coaching her, I am mentoring her, I am working with her."  When Bernal reiterated "I will go to HR and inform you after the fact," Svoboda ended the meeting. Id.

Bernal's relationship with Svoboda was never the same, and the highly positive position he held within BIPLC soon evaporated.  Id.

**Retaliatory hostile work environment and threatened demotion.**

Bernal and Svoboda would typically see each other at least once a day, and Svoboda would regularly stop at Bernal's office door to chat. Id., ¶ 17.  This stopped immediately after July 19th.  Svoboda only interacted with Bernal when required, and instead of walking past Bernal's office to the coffee station, he observed Svoboda take a weird route through the adjacent cubicles.  Bernal believed Svoboda was angry and purposely avoiding him because of his threat to go to HR.  Id.

Bernal, however, continued to build out the new Enforcement team.  He also finalized the workshop agenda, materials, and list of attendees. Id., ¶ 18.  Yet, days before the workshop Svoboda accused Bernal of being "disgruntled" and abruptly removed him from the Enforcement position.  Id.  This was the only reason Svoboda gave for this decision.  A stunned Bernal denied being disgruntled.  Id.  Svoboda told Bernal that he was being returned to his GP&T management

BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT      No. 2:22-cv-00533-TL - 5

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

position, but that he had until the end of the year to find a management position outside BIPLC or he would be demoted out of management.  Svoboda instructed Bernal to not discuss with anyone why he was removed from Enforcement, or the threat to remove him from management.  Id.

The following week, Bernal's planned Enforcement workshop was a success.  Id., ¶ 19.  At a later staff meeting, Svoboda praised by name all who set it up and participated—everyone except Bernal.  Bernal had to endure his humiliation silently, even as coworkers who knew he had organized the workshop commented to him on Svoboda's glaring omission.  Id.

In September, several more complaints were lodged regarding Beltz, including from Alexei Naimushin, the America's team manager.  Id., ¶ 20.  Naimushin had on multiple occasions told Bernal that Beltz had pressured him to target his older employees.  Yet, Naimushin also told Bernal that such treatment was "against his morals," and "against Boeing policy," and the pressure caused him to be physically ill with stress.  Id.  Right after Naimushin filed his EEO complaint, he took a leave of absence.  Id. Beltz temporarily replaced Naimushin with an employee in his 30's who had only joined CAL the previous year.  Id.

At the end of September, the person who replaced Bernal as the Enforcement manager left to accept another position.  Id., ¶ 21.  When Bernal met with Svoboda the following week for their monthly 1:1, he asked to fill the position.  Svoboda dismissed the idea, telling Bernal that his "style" of management was no longer wanted, and instead, Svoboda wanted "drivers, like Linda [Beltz]."  Id.  Then somewhat chuckling, Svoboda told Bernal that he could apply for the position "and, we'll just see how that goes."  Id.

Bernal did not apply for the Enforcement manager position because he believed it would have been futile.  Id.  Instead, he continued to work with his team on existing projects, on

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 6**

developing GP&T's new statement of work models, and to also look for other management positions at Boeing.  Id.  Yet, despite his years of consistent promotion and positive management experience, Bernal was consistently met with disappointing job search results as people were not responding to him in the same positive manner he had enjoyed for years.  Id.

In December 2018, Svoboda interviewed a GP&T team member (Lisa Lepore) for a possible transfer to another team.  Id., ¶ 22.  Bernal only learned of the interview when Lepore called him to complain that she felt blind-sided.  Bernal, her manager, had to confess to Lepore that he had no idea that Svoboda planned to interview her.  Id.  Bernal believed that Svoboda intended for Bernal to feel – and Bernal did feel – humiliated, embarrassed, and marginalized by this action.  Id.

Also in December, Bernal received his 2018 performance review.  Reviews generate an overall performance rating and then a resulting "IPS" rating.  Id., ¶ 23.  Previously, Bernal's overall performance ratings had resulted in "IPS" ratings of a 0.95.  Id.  In 2018, Bernal had met or exceeded his performance metrics (2 met, 2 exceed, and 1 far exceeds) and he expected an overall performance rating of "exceeds" and an IPS rating of 0.95.  Id.  Yet, despite Bernal's performance metrics, Svoboda gave him an overall performance rating of "met" and an IPS rating of 0.85.  Id.; Boyle Decl., ¶ 4, Exhibit 3. When Bernal challenged the overall "met" rating, Svoboda claimed "[f]or me, it's more than just about the numbers.  The results have to be meaningful."  Boyle Decl., ¶ 5, Exhibit 4.  Bernal's 0.85 IPS score was a highly problematic rating for a manager, and he was very stressed that the rating would be used to justify a PIP that would then be used as a justification to fire him.  Bernal Decl., ¶ 23.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT     No. 2:22-cv-00533-TL - 7**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

Bernal provided a written rebuttal to his 2018 review setting out his July threat to go to HR regarding Beltz, and Svoboda's immediate decision to remove him from the Enforcement manager position and threaten to demote him. Boyle Decl., Exhibit 3.

**Bernal not demoted at the end of the year.**

Bernal was unable to find a position outside BIPLC by the end of 2018, but continued working in his GP&T manager role.  Bernal Decl., ¶ 25.  Svoboda never told Bernal that he was being given more time to find another position.  Id.  As explained by Svoboda in an email to his boss Pete Hoffman, the lack of demotion was due to "HR is recommending we don't re-classify [Bernal] as a Level 5, at least at this time."  Boyle Decl., ¶ 6, Exhibit 5.

Svoboda clearly wasn't happy with this decision, and he continued to treat Bernal in a dismissive and marginalized manner.  Bernal was still the manager of the GP&T team, yet much like the Lepore interview, he directly tasked a meaningful assignment with Volvo to a GP&T member without ever discussing the assignment with Bernal.  Bernal Decl., ¶ 25.  Bernal, again, only learned this information from the team member. Id. Then, in February during their monthly 1:1 meeting, Svoboda mockingly asked Bernal "what do you do around here?"  Svoboda knew Bernal took great pride in his work ethic and professionalism, and Bernal viewed the question as intending to belittle and demean him and his work – which, for Bernal, it did.  Id., ¶ 26.

Later in February, Hoffman abruptly announced that Svoboda would be retiring on 5/2/19. Id, ¶ 27.  Svoboda raised his retirement with Bernal when they met in early March for their 1:1 meeting.  Svoboda told Bernal that, due to his retirement, there would be no organizational changes regarding Bernal or his GP&T team.  Id.  Instead, the new BIPLC director would decide

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 8**

BOYLE MARTIN THOENY, PLLC
100 West Harrison, South Tower, Ste. 300
Seattle, Washington 98119
Telephone: 206.217.9400
Facsimile: 206.217.9600

what changes, if any, to make.  Id.  Bernal immediately shared this information with his team.[5]
Bernal Decl., ¶ 27.

On 4/3/19, Svoboda sent Hoffman an email regarding an earlier conversation he had with
HR regarding demoting Bernal.  Boyle Decl., ¶ 7, Exhibit 6, at 006318.  The contents of the email
make clear that Svoboda had been informed by HR that there was a process ("surplus") that had
to be followed.  Most significantly, that process left open the possibility that Bernal would not be
demoted.  Instead, the process could result in some other employee being given "an offer to
reclassify to a level 5."  If the chosen employee rejected the offer, he or she would get a WARN
layoff.  Id.  As of the date of this email, Svoboda appears to understand that any decision
regarding Bernal could not be final until the process was completed.[6]

On 4/8/19, Svoboda and Bernal again met for their monthly 1:1.  Despite what Svoboda
told Bernal in their March 1:1, in this meeting he told Bernal that Boeing was going to make him
a job offer for a position as a Level 5 IP Licensing Specialist that would be supervised by Beltz.
Bernal Decl., ¶ 28.  Svoboda also told Bernal that he will be given 10 days to accept or reject the
job, but if he rejected it, he'd receive a layoff package.  Id.

Yet, that same day, Svoboda followed up on his above 4/3 email to Hoffman (in which he
sets out the process for determining which employee would get the reclassification offer).  Boyle
Decl., Exhibit 7.  In his follow-up email Svoboda indicates the decision that Bernal would be the
demoted employee had not yet been made: "*In thinking ahead, **if** we offer Paul a level 5 position*,
we'll also need to figure out what his SOW [statement of work] will be."  Svoboda then asks

---

[5]  Bernal reflects Svoboda's comment in the EEO complaint he filed with Boeing shortly after his demotion.  Boyle
Decl., ¶ 7, Exhibit 6, at page 000211.
[6]  Boeing has not, however, produced documents establishing that Svoboda actually followed this process.  Id.

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1   Hoffman for his input, but Hoffman does respond to the request until well after the close of

2   business on 4/8/19.  Id.

3          Yet, on 4/10/18, Bernal received a letter informing him that, due to a "surplus," he was

4   being offered reassignment to a non-management position, but one still supervised by Svoboda.

5   Bernal Decl., ¶ 29. In bold letters, the letter also informed Bernal that Boeing's offer was

6   contingent upon a subsequent decision regarding whether Bernal was eligible for the

7   reassignment. Id. In the event Boeing determined Bernal was not eligible for the position, the

8   reassignment offer would become "null and void" unless his current manager waived the

9   ineligibility.  The letter did not inform Bernal what would occur if the offer was withdrawn, it did,

10  however, tell Bernal he had three days to accept or reject the offer, and a rejection would lead to

11  his termination.  Id.

12         On 4/15/19 Bernal received a second reassignment letter from Boeing.  Id., ¶ 30; Boyle

13  Decl., ¶ 9, Exhibits 8-10.  This second letter was identical to the April 10th letter – including the

14  "contingency" warning – except this letter designated Beltz as the supervisor and not Svoboda.

15  Bernal Decl., ¶ 30. The fluctuations and information from the Boeing letter caused Bernal to be

16  uncertain what the ultimate outcome would be, but to avoid termination, he accepted the offer on

17  4/17/19 – within the 3-day period set out in the 4/15/19 letter.  Id.; Boyle Decl., ¶ 9, Exhibit 9.

18         On 4/18/19, Svoboda came into Bernal's office and told him that the reassignment offer

19  was no longer tentative and the reassignment would happen the following day.  Bernal Decl., ¶

20  31.  Svoboda sent out an email later that day to the nationwide IPM group confirming Bernal's

21  move (to the position in which he is still employed).  Id.  Bernal was not told, and he does not

22  know when or how the issue of his eligibility for the position was resolved.  Id.

**BERNAL DECLARATION IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT      No. 2:22-cv-00533-TL - 10**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Bernal begins working under Beltz.**

Svoboda did not need to move Bernal to Beltz's team.  Id., ¶ 32. Svoboda had other positions, on teams supervised by someone other than Beltz (or Steensland) into which he could have reassigned Bernal.  In fact, Svoboda moved Bernal's GP&T team under Senior Manager, Kim Johnson, and he could have kept Bernal with his team doing work he was familiar with. Id.

Instead, Svoboda moved Bernal to a position he had no experience in, and once there, neither Svoboda or Beltz made arrangement for Bernal to receive training typically provided to someone in a new position – duties of the new position and the computer programs necessary to perform them. Id., ¶ 10.  Svoboda and Beltz required Bernal to figure out this information and skills on his own.  As a result, Bernal had to impose on busy coworkers (some whom he had previously managed) for training.  Id.

Also, despite Bernal's tenure, Svoboda and Beltz applied the remote work restrictions for new, probationary employees to Bernal.  Id., ¶ 34.  Bernal was told that Svoboda would allow the restriction to be reconsidered in a few months.  Id.  Bernal believed the only reason Svoboda and Beltz applied the probationary employee policy was to further humiliate him, which it did.  Id.

Bernal was required to move out of his office and assigned a cubicle next to a row of cubes that employees on Beltz's team referred to as "the Green Mile" because of who sat there: older workers who were either experiencing harassment or had left Boeing voluntarily or involuntarily due to the hostile work environment and discrimination they experienced.  Id., ¶ 35.

Once Beltz was Bernal's supervisor, she pressured him to withdraw from his long-time, prestigious Boeing volunteer roles as a leader in Boeing's Diversity program, and a mentor Boeing's "Women Inspiring Leadership" and Native American Network.  Id., ¶ 36. When Bernal

BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT     No. 2:22-cv-00533-TL - 11

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

refused, Beltz took away his volunteer budget, and with great effect, she got the new BIPLC Director, Coleen Burke-Finney, to pressure Bernal: Bernal felt compelled to concede and limit his volunteer work.  Id.  Bernal did, however, continue his existing mentoring relationships.  When Beltz learned of that decision she demanded full access to Bernal's calendar, the names of the people he was mentoring, and the locations of where he met with them.  Id.

At no time did Beltz claim that Bernal's volunteer work interfered with his work, and indeed, it did not.  Id., ¶ 37.  Beltz knew Bernal enjoyed his volunteer roles and that they allowed him to work with Boeing executives and other high-level managers.  Bernal believed Beltz wanted to lessen his positive experiences and connections that came from his volunteer work. Id.

Bernal's first assignment on Beltz's team was writing BIPLC's "Release of Boeing Proprietary Information" ("RBPI") applications.  Id., ¶38. RBPI applications are complex and require the approval of multiple departments before BIPLC can utilize them in their work.  Beltz had long been responsible for the task but had only gotten two RBPIs approved.  Yet, Beltz gave Bernal 10 weeks to complete the entire catalogue. Id. To the amazement of his peers, Bernal was able to create and gain approval for the majority of the necessary RBPI by the deadline, and after a brief extension approved by Beltz, he finished it. Id. To highlight the significance of the work done by Bernal, a member of another BIPLC team used the RBPI template Bernal had developed to get one RBPI application approved.  That coworker received corporate accolades after her manager promoted the success.  Id. Beltz, however, took Bernal's significant accomplishment as an opportunity to humiliate him by briefly mentioning it during a subsequent team meeting, and then "awarding" him with 3 tokens for free ice cream at the Boeing cafeteria.  Bernal was embarrassed and humiliated by conduct he viewed as intended to diminish his work.  Id.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT      No. 2:22-cv-00533-TL - 12**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

When Beltz provided Bernal with his 2019 performance review, she cited as a deficiency his failure to meet the original RBPI deadline.  Id., ¶ 39.  After Bernal pointed out that she had approved an extension, she changed the review to intimate that Bernal had now misrepresented the deadline.  Id.  Within a few months, Boeing shut down in-person operations due to the COVID pandemic.  Bernal's interactions with Beltz were limited to bi-monthly 1:1 telephone calls and monthly group video conference meetings.  Id., ¶ 40.  Beltz was often late joining her 1:1 calls with Bernal, and during the meeting she regularly appeared distracted or was doing something else like making lunch or eating.  While Bernal was relieved to have the limited interaction with Beltz that came with remote work, her attitude made him feel disrespected and that his work was unimportant.  Id.

As a result of all of the above, Bernal's work environment became joyless, and he felt consistently humiliated and undermined.  Id, ¶ 41. He suffered (and to varying degrees continues to) economic damages, and emotional and physical distress including humiliation, embarrassment, anger, eye spasms, loss of confidence, and some depression and sleep loss.  Id.

## V.      ARGUMENT AND AUTHORITY

### 1.      Motion to Strike.

Boeing's motion materials include declarations from Svoboda and Hoffman.  The Svoboda declaration contains hearsay that should be struck, and the Hoffman declaration should be struck in its entirety because Boeing has not properly identified him as a witness.[7]

---

[7]  Bernal has provided hearsay in his Declaration and this response brief, in the form of what coworkers reported to him regarding their treatment by Beltz and Steensland, to establish that he had a reasonable belief at the time of his protected conduct that discrimination was occurring.

BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT      No. 2:22-cv-00533-TL - 13

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

**Svoboda declaration.** The Svoboda declaration includes references to decisions and direction provided by unnamed individuals ("Senior Leadership" "new Chief Technology Officer") and also from Greg Hyslop. Such references are hearsay and should be stricken.

The sections of the Svoboda declaration that should be stricken are:

- ¶ 5 (2:15-18), 6 (Exhibit B, at TBC-BERNAL_000165, final sentence in "Priorities Summary");
- ¶ 7 (3:5-8);
- ¶ 8 (3:16-19, Exhibit C, in "Note to File" section, the two sentences following notation for subsection (i);
- ¶ 11 (Exhibit D, first sentence of Svoboda email following the comma);
- ¶ 13 (Exhibit F, that part of first sentence that precedes the comma)

This ruling is particularly compelled by Boeing's failure to name as a witness any individual in Bernal's chain of management other than Svoboda. In fact, Boeing's use – via Svoboda's declaration – of alleged comments by Hyslop is particularly objectionable.

After Boeing produced the above Exhibits C and D referencing Hyslop, Bernal noted his deposition (to occur via Zoom and take an hour). Boyle Decl., ¶ 10, Exhibit 11, Exhibit 12 (page 3). In response, Boeing stated that it would not produce Hyslop because the "apex doctrine" protected corporate officers, like Hyslop, from appearing for "harassing" depositions. Boeing claimed the deposition would be harassing because Hylsop "does not appear to have any connection to, or any knowledge of, facts that may be material to the resolution of the claims in this lawsuit." Id., ¶ 11, Exhibit 12, at page 4(top). When Bernal asked if Boeing planned to move for a protective order, Boeing cited the timing of Hyslop's deposition – after the discovery motion cutoff – precluded Bernal from compelling the deposition, and similarly, a protection order "was neither required nor permitted." Id., ¶ 13 (page 1). Hyslop did not appear for his noted deposition. Id., ¶ 10.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT     No. 2:22-cv-00533-TL - 14**

BOYLE MARTIN THOENY, PLLC
100 West Harrison, South Tower, Ste. 300
Seattle, Washington 98119
Telephone: 206.217.9400
Facsimile: 206.217.9600

Boeing should be precluded from using any alleged statements by Hyslop.

FRCP 26(a)(1)(A)(i) requires a party to identify "each individual likely to have discoverable information…that the disclosing party may use to support its claims or defenses…" Boeing has never identified Hyslop as a witness.  Id., ¶ 14.  As a result, FRCP 37(c)(1) precludes its use of his testimony – albeit, hearsay via Svoboda's Declaration – in their case.  This same sanction should be imposed under FRCP 37(d) as a result of Hyslop's failure to appear for his deposition.

**Hoffman declaration.**  In addition to requiring identification of "each individual likely to have discoverable information," FRCP 26(a)(1)(A)(i) also requires a party to identify the "subjects of that information—that the disclosing party may use to support its claims or defenses."  In its Initial Disclosures Boeing identified nine individuals (including the plaintiffs), and for most it offered two paragraphs of "subjects of information" – paragraphs that clearly relate to Bernal.  Id., ¶ 15, Exhibit 15.  In stark contrast, however, describing the information Boeing expected to use from Hoffman Boeing offered one-line that clearly does not relate to Bernal:  "Mr. Hoffman may have knowledge about involuntary layoff decisions affecting Coe." Id.  This limited subject identification had to be intentional.

Later, in response to Bernal's discovery request seeking essentially the same information required in initial disclosures, Boeing relied upon its Initial Disclosures.  Boyle Decl., ¶ 16, Exhibit 16.  Boeing did later supplement that discovery answer by also providing "Pursuant to FRCP 33(d), the persons referenced in the produced discovery and in Plaintiff's Initial Disclosures and discovery documents are also incorporated."  Yet, Boeing's supplementation – which was only provided after the close of discovery – is not reasonably viewed as complying

BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT     No. 2:22-cv-00533-TL - 15

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

with FRCP 26(a)(1)(A)(i).   As such, Boeing has not timely disclosed that it intended to use

information from Hoffman to defend against Bernal's claim, and pursuant to FRCP 37(c)(1) it

should be precluded from using Hoffman's declaration in support of its current motion.

### 2.      Standard for summary judgment in employment discrimination cases.

Summary judgment is appropriate if the evidence viewed in the light most favorable to the

non-moving party shows "that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it might

affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is not appropriate if "a result other than that proposed by the moving party is

possible under the facts and applicable law." See Aronsen v. Crown Zellerbach, 662 F.2d 584,

591 (9th Cir.1981), cert. denied, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983).   In

discrimination cases, summary judgment motions must be carefully examined in order to

"zealously guard an employee's right to a full trial, since discrimination claims are frequently

difficult to prove without a full airing of the evidence and an opportunity to evaluate the

credibility of the witnesses." Weil v. Citizens Telecom Servs. Co., 922 F.3d 993, 1002 (9th Cir.

2019)(internal citations omitted).

In this matter, Boeing argues Bernal's retaliation claim is either untimely or not supported

by sufficient evidence.  For the same reasons stated by this Court in its recent ruling on Boeing's

earlier 12(b)(6) motion,[8] Boeing's current arguments should be found without merit and rejected.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT      No. 2:22-cv-00533-TL - 16**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

**1.** **Bernal has brough a timely retaliatory demotion claim:**

Boeing claims that Bernal's retaliatory demotion claim was not brought within the three-year statute of limitations and should be dismissed.  See, <u>Antonius v. King County</u>, 153 Wn.2d 256, 103 P.3d 729 (2004).[9]  Bernal agrees that the holdings in <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250 (1980) and <u>Albright v. State</u>, 65 Wn.App. 763 829 P.2d 1114 (1992) dictate the date upon which the statute of limitations begins to run on a discrimination claim under RCW 49.60,*et.seq.* Yet, Boeing's argument on summary judgment simply ignores facts critical to a determination of how those cases apply in this case.  When the full facts are considered, the holdings in <u>Ricks</u> and <u>Albright</u> do not support Boeing's argument that Bernal's retaliatory demotion claim is untimely.

In <u>Ricks</u>, the plaintiff was a college professor denied tenure and, as a result, given a final, one year employment contract.  Ricks sued the college asserting its tenure decision was discriminatory.  Ricks suit was filed within three years of the end of the one-year contract, but not within three years of the date he was informed of the final tenure decision.  Consequently, the College asserted Rick's discrimination claim was untimely and moved for dismissal.  On appeal, the court agreed.  When doing so, the court ruled that Ricks had failed to file within three years of the event that triggered the statute of limitations: the date on which the Board provided Ricks with written notice of its final decision to deny him tenure.  The court found the written notice triggered the statute because it made clear to Ricks that the decision to deny tenure was the Board's "official position," and that the decision was not "*in any respect tentative*."  449 U.S., at 261 (emphasis added).  In other words, the notice made clear to Ricks that the Board's decision to deny tenure was *unambiguously a final decision*.

---

[8]  See, Court file, Dkt. No. 35.

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

In <u>Albright v. State</u>, the plaintiff sued the State of Washington alleging that he had been unlawfully denied accommodation for his disability.  As in <u>Ricks</u>, the State sought dismissal of Albright's claim asserting it was not filed within three years of the event it claimed triggered the statute: a letter informing Albright that he would be required to remain in his assigned position. On appeal, the court rejected the State's argument because, although the letter implied that Albright would not be accommodated, the letter did not directly deny his request for accommodation.  Instead, the court found the statute on Albright's failure to accommodate claim triggered only when the State provided him with a letter stating its "official decision" to deny his request for accommodation.  Therefore, as in <u>Ricks</u>, the court in <u>Albright</u> found the statute triggered on the date the plaintiff received unequivocal notice that the State had made a ***final decision*** to deny accommodation.

Thus, the issue in this case is on what date did Boeing inform Bernal that it had made a ***final decision*** to place him in a non-management position, and did Bernal file this matter within three years of that date.  The holdings in <u>Ricks</u> and <u>Albright</u> dictate a finding that he did.

Unlike on its FRCP 12(b)(6) motion, Boeing now asserts that Bernal's suit is untimely because he Bernal received notice that a final decision had been made to demote him on 8/2/18: "[t]he original notice of the decision to reassign (08/02/2018), the written record of the final decision to implement the reassignment (03/20/2019), and the final communication of the implementing decision to reassign (04/08/2019), all occurred outside of the limitations period. …and Bernal is therefore precluded from seeking relief for any such purported act of retaliation."

---

9  Bernal addresses other acts occurring outside the limitations period in the below argument on his claim.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 18**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

Boeing's Motion, at 7:13-17.  For several reasons, including the reasons previously found by this Court, Boeing's argument should be rejected.

The letters to Bernal state that he was being offered a reassignment to a non-management position because of a "surplus."  As discussed above, Svoboda had to follow a process before any decision could be made regarding whether Bernal – or some other employee – would be reclassified to a non-management position.  See, Boyle Decl., Exhibit 7.  It is not reasonably disputed that Svoboda was unaware of that process, and had not complied with it prior to either his 8/2/18 threat to Bernal or his 3/20/19 email to HR.

Other events further belie Boeing's current argument regarding Bernal being told of a final decision on 8/2/18: Svoboda's 1/7/19 email to Hoffman stating "HR is recommending we don't re-classify [Bernal] as a Level 5, at least at this time," Id., Exhibit 5; and (2) Svoboda's comment to Bernal at their March 2019 1:1 that the new Director would decide what changes to make regarding Bernal and his team. Id., Exhibit 6 (page 000211); Bernal Decl., ¶ 27.

Finally, despite what Svoboda told Bernal on 4/8/19 – that he was going to demote Bernal to a Level 5 position under Beltz – his email to Hoffman that same day shows that no decision had been made that Bernal would be the employee offered the reassignment.  Boyle Decl., Exhibit 7.

**Boeing's contingent reassignment offer to Bernal.**

In its current motion, Boeing does not argue it is entitled to summary judgment on Bernal's retaliatory demotion claim because the communications it had with him after 4/8/2019 communicated to him that the final decision to demote him had been made.  As such, Bernal has no argument to respond to.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    No. 2:22-cv-00533-TL - 19**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1

2

3

As a result, Bernal has shown that the communications he had with Svoboda and Boeing before 4/18/19 – when he was told the demotion was no longer tentative – could not and did not convey to him that a final decision to demote him had been made.

4

5

6

7

8

Based upon the above, Bernal retaliatory demotion claim was timely filed.  Contrary to Boeing's current argument, it had not made a final decision to demote Bernal on either 8/2/18 or 4/8/19, and Bernal was not informed of its final decision until 4/18/19 – less than three years from the date of filing.

9

**2.   Retaliatory hostile work environment.**

10

11

Boeing argues that Bernal's retaliatory hostile work environment claim fails because he has not alleged acts actionable under RCW 49.60, *et.seq.*  Boeing's argument is without merit.

12

13

14

15

16

17

18

19

20

21

22

23

24

Bernal's retaliation claim requires that he show (1) he engaged in statutorily protected activity; (2) he subsequently suffered an adverse action; and (3) there is a causal link between his protected activity and the subsequent adverse action.  Estevez v. Faculty Club of the University of Washington, 129 Wn. App. 774, 120 P.3d 579 (2005).  In Washington state, the creation of a hostile work environment following protected conduct can be a retaliatory "adverse action." Kirby v. City of Tacoma, 124 Wn. App. 454, 98 P.3d 827, 833 (2004).  To establish a retaliatory hostile work environment, Bernal must show (1) that he experienced unwelcomed harassment, (2) the harassment was because he had engaged in protected conduct, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer. Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275, 285 P.3d 854 (2012); Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000).  By its motion, Boeing argues that Bernal has failed to assert acts

25

sufficient to raise an issue of fact on the third element.  Boeing's argument should be rejected.

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT     No. 2:22-cv-00533-TL - 20**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

**<u>Bernal's hostile work environment claim properly includes pre-statutory acts</u>**.

Boeing argument fails to address the asserted pre-statutory acts that should be considered in determining the sufficiency of Bernal's retaliatory hostile work environment claim.

A hostile work environment occurs over time and is "based on the cumulative effect of individual acts." <u>Loeffelholz v. Univ. of Wash.</u>, 175 Wn.2d 264, 273, 285 P.3d 854 (2012). Courts recognize that individuals acts asserted in a hostile work environment claim may span the statute of limitations.  In such a case, the "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." <u>Antonius v. King County</u>, 153 Wn.2d 256, 271, 103 P.3d 729 (2004), citing <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 120, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  To be part of the same actionable hostile work environment, the acts must have some relationship to each other, <u>Antonius</u>, at 264-271, however, "[t]he standard for linking discriminatory acts together in the hostile work environment context is not high." <u>Loeffelholz</u>, 175 Wn.2d, at 276.  Once linked, a claim is timely if at least one of the alleged hostile acts occurred within the limitations period, <u>Id.</u>, at 270.  Thereafter, "a plaintiff [may] recover for all related conduct straddling the statute of limitation." <u>Loeffelholz</u>, at 275.

As set forth in the above Statement of Facts, Bernal has asserted pre-statutory acts that include: (1) his manager stopped being friendly and avoided him; (2) abrupt removal from leading the Enforcement team; (3) being threatened with demotion; (4) having his interest in management positions being discounted because he now had an undesirable "style" of management; (5) being provided with a derogatory performance review that did not reflect his objective performance.

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

Also as set for in the facts, those pre-statutory acts were followed by a series of statutory period acts: (6) demotion into a non-management position, (7) placement into a position he was not experienced in and that would be supervised by Beltz, a supervisor Svoboda could reasonably expect to treat Bernal, an older worker, in a hostile manner; (8) provided no training on the duties of the new position or the computer programs necessary to perform them; (9) assignment to a cubicle by a row known as the "Green Mile;" (10) being subjected to new-hire probation restrictions on remote work; (11) without legitimate reason being repeatedly pressured to resign from prestigious Boeing volunteer roles, and Beltz bringing in the new Director to apply additional pressure; (12) required to provide his manager with full access to his calendar, to identify the people he was mentoring and the locations where they would meet; (13) having a significant work accomplishment disregarded, and being "awarded" for that work with 3 tokens for a free ice cream at the Boeing cafeteria; (14) provided with a performance review that falsely accused him of failing to meet a significant deadline and also implying he misrepresented the true deadline; and (15) experiencing his manager being frequently late for meetings with him and often also appearing distracted or eating.

A reasonable review of the above acts supports a finding of a course of linked acts, one of which occurred within the limitations period: the acts are temporally related, they involve either the same manager, or a manager who would predictably further the retaliation, they also involve the same type of humiliating, marginalizing, and demeaning conduct – all of which was intended to impress upon Bernal that he was now a disfavored and disrespected employee.

**Bernal's has produced sufficient evidence of an abusive working environment.**

BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT    No. 2:22-cv-00533-TL - 22

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1
2
3

Boeing's argument centers on its claim that Bernal cannot produce sufficient evidence to raise an issue of fact on the third element of his claim: that the harassment affected the terms and conditions of employment.  This argument may also be rejected.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

A court will find that the cumulative effects of individuals acts establish a hostile work environment if, "considering the totality of the circumstances," the hostile conduct "is sufficiently pervasive to alter the employee's employment conditions and create an abusive working environment." Loeffelholz, 175 Wn.2d, at 275. That is, a hostile work environment will be found when "hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." Perez v. United States Postal Service, 76 F.Supp.3d 1168, 1187 (2015), citing, McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112–13 (9th Cir.2004).  The hostile conduct must "be 'objectively abusive' and subjectively perceived as abusive or offensive by the employee." Clarke v. Attorney Gen. Office, 133 Wn.App. 767, 787, 138 P.3d 144 (2006).  Objective hostility is shown when the totality of the circumstances render the work environment one that a reasonable person – in the plaintiff's position – would find hostile or abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Subjectively, "[h]umiliation, emotional distress, absence from work, or 'friction' with other employees are sufficient to create an 'inference' that such reactions resulted from a hostile work environment." Davis v. West One Auto Grp., 140 Wn.App. 449, 458, 166 P.3d 807 (2007).

22
23
24
25

In this case, at a minimum, the above cited acts allow Bernal to make this showing, and defeat Boeing's motion.  That is, the acts Bernal complains of are not reasonably viewed as "casual, isolated, or trivial," or simple "teasing" or "offhand remarks."  Instead, the evidence is

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

1   sufficient to allow for a finding that the linked acts were sufficiently pervasive to objectively

2   create an abusive working environment, and that for Bernal, they did.  Bernal Decl., ¶ .

3          In sum, Bernal has met his summary judgment burden and his claim that he was subjected

4   to a retaliatory HWE and demotion should be allowed to go forward.

5                                    **VI.    CONCLUSION**

6          Based upon the foregoing, Boeing's motion for summary judgment should be denied.

7   DATED this 13th day of March, 2023.

8

9                                    BOYLE MARTIN THOENY, PLLC
                                     ___s/Margaret M. Boyle_____
10                                   Margaret M. Boyle, WSBA#17089
                                     Attorneys for Plaintiffs
11                                   100 W. Harrison, South Tower, Ste. 300
                                     Seattle, Washington  98119
12                                   (206)217-9400/margaret@boylemartin.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**BERNAL DECLARATION IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT     No. 2:22-cv-00533-TL -** 24

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

**DECLARATION OF SERVICE**

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system so that notification of such filing will be sent to the following attorneys of record for defendants:

Larry Shapero:  laurence.shapero@ogletree.com

Brenda Bannon:  brenda.bannon@ogletreedeakins.com

SIGNED this 13th day of March, 2023, in Seattle, Washington.

_____

MARGARET BOYLE

**BERNAL DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT     No. 2:22-cv-00533-TL - 25**

BOYLE MARTIN THOENY, PLLC
100 WEST HARRISON, SOUTH TOWER, STE. 300
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600