UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PAUL BERNAL,<br><br>           Plaintiff,<br>     v.<br><br>THE BOEING COMPANY,<br><br>           Defendant. | CASE NO. 2:22-cv-00533-TL<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

This is an action for damages under the Washington Law Against Discrimination ("WLAD"), RCW 49.60 *et seq.*, for alleged retaliation. This matter is before the Court on Defendant the Boeing Company's Motion for Summary Judgment (Dkt. No. 30). Having considered Plaintiff Paul Bernal's response (Dkt. No. 39), Defendant's reply (Dkt. No. 40), and the relevant record, the Court DENIES the motion.

### I.   BACKGROUND

The following facts are undisputed unless otherwise noted.

ORDER ON MOTION FOR
SUMMARY JUDGMENT - 1

A.      **Plaintiff's Prior Work History**

Plaintiff was hired by Defendant in 1989 and worked for Defendant through the events of this case. Dkt. No. 37 ¶ 2 (Plaintiff declaration). He received positive performance reviews, pay raises, and bonuses. *Id.* He was also promoted, including in 2011 when he entered an "M Level" manager position in Defendant Boeing's Intellectual Property Licensing Company ("BIPLC").[1] *Id.* In 2013, Rick Svoboda became the director of BIPLC, and Plaintiff reported to him. *Id.* ¶ 3. That same year, at Svoboda's invitation, Plaintiff was tasked with developing and managing the new Global Patent & Technology ("GP&T") team. *Id.*

In 2014, Svoboda hired Linda Beltz to be the "M Level" manager of BIPLC's Commercial Aviation Licensing ("CAL") team. *Id.* ¶ 4. Plaintiff heard through coworkers that Beltz had a reputation for creating a hostile work environment for BIPLC's older workers. *Id.* This reputation spread to a first-level manager who appeared to emulate Beltz's behavior. *Id.* ¶¶ 5–6. Plaintiff learned that multiple internal complaints had been filed about Beltz and the new manager, and he discussed the complaints with Svoboda. *Id.* ¶¶ 8, 10; *id.*, Ex. 1 (email from ex-employee to Svoboda). In April 2018, Svoboda suggested that Plaintiff lead the CAL team instead of Beltz, which Plaintiff agreed to do. *Id.* ¶ 11; *see* Dkt. No. 38 at 9 (email from Svoboda to his boss Peter Hoffman). That change never happened.

B.      **Plaintiff's Reassignment**

     1.      **June 2018–July 2018**

In June, Svoboda instead asked Plaintiff to lead an IP enforcement team within BIPLC. Dkt. No. 37 ¶ 12. Plaintiff shared his reservations with Svoboda and told him that he was not excited about leading the team. *Id.*; Dkt. No. 31 at 38 (68:3–6) (Plaintiff deposition) ("I said, I'm

---

[1] Defendant also refers to BIPLC as its "Intellectual Property *group*." Dkt. No. 30 at 1 (emphasis added). Neither Party argues that the status of BIPLC is relevant to Defendant's alleged liability.

not really that excited about it. It's not my area of expertise. I would prefer to continue leading GP&T . . . ."); *id.* at 39 (69:2–3) ("I said not that interested. Not my desires, passions."). Plaintiff told Svoboda that he would "think about it and come back to you." *Id.* (69:4).

In early July, the two men spoke again about the proposed IP enforcement role. *Id.* (69:7–9). Plaintiff said, "I've given it some thought. I'll take it, I'll do it." *Id.* (69:17–18). Svoboda said that he needed "120 percent" and "somebody dedicated." *Id.* (69:20–21). Plaintiff responded that he would give "100 percent" and "knock it out of the park." *Id.* (69:22–23). Plaintiff does not recall how the meeting ended, nor does Defendant provide evidence as to how it ended. *See id.* at 39–40 (69:25–70:24). But following the meeting, Plaintiff began to lead the IP enforcement team and updated Svoboda on his work. Dkt. No. 37 ¶¶ 15, 18; *see also* Dkt. No. 32 ¶ 7 ("[Plaintiff] was a sort of transitionary placeholder developing a workshop while I evaluated next steps.").

On July 19, Svoboda told Plaintiff during a meeting that Plaintiff's team would be required to work closely with Beltz. Dkt. No. 31 at 51 (90:23–25). Plaintiff told Svoboda that he "will be going to HR [Human Resources]" if Beltz targeted him or his older team members for harassment. *Id.* at 52 (91:7–10). Svoboda "raised his voice," stating, "[Y]ou can't do that. . . . I'm coaching her, I'm mentoring her, I'm working with her. You cannot go to HR. You bring all complaints to me." *Id.* (91:11–15). Plaintiff stated, "I will be going to HR and informing you after the fact." *Id.* (91:16–17). At that point, the meeting ended. *Id.* (91:18–20). Whereas Plaintiff and Svoboda would typically see each other once a day and Svoboda would "regularly" stop by Plaintiff's office, "[t]his stopped immediately after July 19." Dkt. No. 37 ¶ 17. Svoboda only interacted with Plaintiff "when required" and took a "weird route" to avoid passing Plaintiff's office on the way to get coffee. *Id.* In "late July," Svoboda ultimately selected a different person, Angela Smith, to permanently lead the IP enforcement team. Dkt. No. 32 ¶ 7.

### 2.    August 2018–December 2018

On August 2, Svoboda called Plaintiff. Dkt. No. 31 at 41 (79:7–9); Dkt. No. 32 ¶ 8. Svoboda stated that Plaintiff "was no longer going to be the enforcement manager," as Svoboda "did not want a disgruntled employee leading the team." Dkt. No. 31 at 41 (79:14–17). He stated that "this decision has been made." *Id.* at 42 (80:2). He told Plaintiff that he had 90 days to develop future options for GP&T and "find another job outside of intellectual property, or you will be demoted out of management." *Id*. (80:4–9); Dkt. No. 32 ¶ 8 ("I specifically informed [Plaintiff] that . . . [Plaintiff] needed to find another Boeing Manager role or else be reassigned.").

In August and September, Plaintiff heard about "several more complaints" that were to be filed against Beltz. Dkt. No. 37 ¶ 20. Also, at the end of September, Plaintiff's replacement, Smith, left her role. *Id.* ¶ 21. When Plaintiff asked to fill the position, Svoboda told him his "style" of management was not wanted. *Id.* He also stated that Plaintiff could apply "and, we'll just see how that goes." *Id.* Plaintiff continued in his role, and he looked for new positions at Defendant without success. *Id.*

In December, Plaintiff received his 2018 performance review from Svoboda. Dkt. No. 31 at 47 (86:18–25); *see* Dkt. No. 38 at 11–17 (review). The meeting was cordial, but the two men "had some disagreements on the scores," as they had with prior reviews. Dkt. No. 31 at 49 (88:10–13); *see id.* at 49–50 (88:18–89:19); Dkt. No. 32 at 11–44 (prior reviews). Plaintiff provided a written rebuttal to the review, setting out his July remarks to Svoboda about going to HR. *See* Dkt. No. 31 at 51 (90:3–11); Dkt. No. 38 (Boyle declaration) at 15–16 (written rebuttal).

At the end of 2018, Plaintiff was still in his GP&T management role, despite Svoboda's 90-day deadline. Dkt. No. 31 at 45 (84:16–18). Plaintiff thus had more time to find a new management position, although Svoboda did not state that he was giving more time. *See* Dkt. No. 31 at 46–47 (85:20–86:2).

### 3. January 2019–March 2019

On January 7, Svoboda emailed Hoffman. Dkt. No. 38 at 22 (email from Svoboda to Hoffman). He told Hoffman that Plaintiff "still hasn't found a position outside IPM" and, notably, that "HR is recommending we don't re-classify him as a Level 5," a demotion, "at least at this time." *Id.* Svoboda also stated that he was "thinking of retaining [Plaintiff] as an M level manager," which "should improve his chances of finding something else . . . ." *Id.*

As Plaintiff continued in his role, he felt that Svoboda "continued to treat [him] in a dismissive and marginalized manner." Dkt. No. 37 ¶ 25. For example, Svoboda made a direct assignment to one of Plaintiff's team members. *Id.* And in a meeting in February 2019, Svoboda asked "mockingly," "[W]hat do you do around here?" *Id.* ¶ 26.

In early March, Svoboda discussed his pending retirement with Plaintiff. *Id.* ¶ 27. He stated that "due to his upcoming retirement there would be no organizational changes regarding [Plaintiff] or [the] GP&T team," instead allowing the new BIPLC director to decide "what changes, if any, to make." *Id.* On March 20, Svoboda told HR that Plaintiff had still not found a new position, "leav[ing] us [Svoboda and Hoffman] with only one alternative and that is to downgrade him to a level 5." Dkt. No. 32 at 48 (email to HR). He asked HR to coordinate with them, "to ensure we are following the right HR process steps." *Id.*

### 4. April 2019

On April 3, Svoboda emailed Hoffman with information he received from HR. Dkt. No. 38 at 32 (email). Svoboda detailed a process that needed to be followed for any reassignment. *Id.* That included a "side by side comparison" of Plaintiff with another employee, after which "[t]he person with the lower rating" would receive "an offer to reclassify to a level 5." *Id.*

On April 8, Plaintiff met with Svoboda. Dkt. No. 15 (First Amended Complaint ("FAC")) ¶ 48. Svoboda told Plaintiff that he would be "moving to a new role." Dkt. No. 31 at 55 (120:22–

25); *see also id.* at 56 (121:12–14); Dkt. No. 32 ¶ 12. He also told Plaintiff that Defendant "was going to make" an offer for a new role as a "Level 5 IP licensing Specialist," which he would have 10 days to accept. Dkt. No. 37 ¶ 9. The same day, Svoboda sent a follow-up email to Hoffman, stating, "In thinking ahead, *if* we offer [Plaintiff] a level 5 position, we'll also need to figure out what his SOW [statement of work] will be." Dkt. No. 38 at 31 (emphasis added).

On April 10, Plaintiff received a letter from Defendant. Dkt. No. 31 at 64 (letter), 66 (same). The letter states that Plaintiff is offered a reassignment "based on surplus" and would be supervised by Svoboda. Dkt. No. 31 at 64; Dkt. No. 37 ¶ 30; *see also* Dkt. No. 38 at 35 (April 10 email from Svoboda to HR) ("The offer says that [Plaintiff] will be reporting to me."); Dkt. No. 37 ¶ 29. The letter also stated that "**Your assignment is contingent upon the following:** . . . ." *Id.* (emphasis in original). That included "employee release requirements," which, if not met, would mean Plaintiff "may be ineligible to transfer and this offer will be null and void." *Id.* Plaintiff was given three days to accept the offer or otherwise resign. *Id.*

After that day and no earlier than April 12,[2] Plaintiff received an identical second letter from Defendant, except it stated that Beltz, not Svoboda, would be his supervisor. Dkt. No. 31 at 64, 66; Dkt. No. 37 ¶ 30; Dkt. No. 38 at 34 (April 12 email from HR stating, "The offer for [Plaintiff] has been extended," after prior email discussion about replacing supervisor name).

On April 17, Plaintiff accepted the offer. Dkt. No. 38 at 41 (April 17 email notification of offer acceptance); Dkt. No. 37 ¶ 30.

---

[2] Defendant points out that Plaintiff's account of the timing of the second letter has changed between the filing of the FAC and the filing of his declaration. Dkt. No. 40 at 9; *compare* Dkt. No. 15 ¶ 53 (letter allegedly received April 12) *with* Dkt. No. 37 ¶ 30 (letter allegedly received April 15). In his declaration, Plaintiff states, "I had initially thought I received the second letter on 4/12/19, but when reviewing the discovery in this case it appears that I received it on Monday 4/15/19." *Id.* Plaintiff does not attach or cite to the "discovery" that indicates receipt on April 15. However, Plaintiff had only three days to accept the offer (Dkt. No. 31 at 66), which he did on April 17 (Dkt. No. 38 at 41) and which was apparently permitted by Defendant, as demonstrated by Plaintiff's continued work for Beltz. *See infra*, Section I.C. This timeline strongly suggests that Plaintiff did not receive the letter until at least April 14, three days prior to acceptance of the offer. Regardless, this issue is not material to resolution of the motion.

On April 18, Svoboda told Plaintiff that "the reassignment offer was no longer tentative" and "would happen the following day."[3] Dkt. No. 37 ¶ 31. Svoboda also "sent out an email to the nationwide IPM group confirming" that Plaintiff had been reassigned. *Id.*; Dkt. No. 32 at 52 (Svoboda email).

C.   **Plaintiff's New Role**

Plaintiff thus began work on Beltz's team, though Svoboda could have assigned Plaintiff to other positions that were not supervised by Beltz. Dkt. No. 37 ¶¶ 32–33. Plaintiff had no experience in the new role and was not given training typically provided to someone in a new position. *Id.* ¶ 33. He was required to comply with restrictions on remote work that applied to new, probationary employees, which "humiliated" him. *Id.* ¶ 34. He was moved out of his office and assigned to a cubicle known by employees on Beltz's team as "the Green Mile" because of the older workers who sat there. *Id.* ¶ 35.

Beltz pressured Plaintiff to withdraw from his long-time volunteer roles at the company and took away his volunteer budget when he refused. *Id.* ¶ 36. Plaintiff also received pressure from the new BIPLC director to withdrawn from his volunteer work. *Id.* Plaintiff limited his volunteer work but continued his mentoring relationships. *Id.* Beltz demanded access to information about those relationships. *Id.* At no time did Beltz allege that the volunteer work affected Plaintiff's normal work. *Id.* ¶ 37.

---

[3] Defendant argues that "for the first time in his opposition declaration," Plaintiff states that he met with Svoboda on April 18—a "new, inconsistent, uncorroborated, and self-serving" statement that should be discounted on summary judgment. Dkt. No. 40 at 9–10. But in the FAC, Plaintiff states that he was "informed" on April 18—separate from Svoboda's email "later that day"—that the reassignment was no longer tentative. *See* Dkt. No. 15 ¶ 54. And in his deposition, Plaintiff was only asked if he had spoken to Svoboda "prior to April 18" about Svoboda's decision to move Plaintiff into a new role; he was not asked about any communication *on* April 18, or whether Svoboda indicated prior to April 18 that the reassignment was no longer tentative. *See* Dkt. No. 31 at 55 (120:18–20, 22–24). Moreover, the April 18 meeting would be squarely within Plaintiff's knowledge. *Cf. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5 (9th Cir. 2002) (discounting a "self-serving and uncorroborated" affidavit asserting facts for which affiant did not show a basis of knowledge).

Plaintiff's first assignment was to write "Release of Boeing Proprietary Information" ("RBPI") applications. *Id.* ¶ 38. "To the amazement of [his] peers," Plaintiff completed most of the applications within a 10-week deadline and completed them all after Beltz approved a brief extension. *Id.* Beltz only briefly mentioned Plaintiff's accomplishment at a team meeting and "awarded" Plaintiff three "tokens for free ice cream at [Defendant's] cafeteria." *Id.* Plaintiff "felt embarrassed and humiliated by what [he] viewed as intentional diminishment of [his] work." *Id.* Later, during Plaintiff's 2019 performance review, Beltz cited as a deficiency Plaintiff's failure to meet the original deadline. *Id.* ¶ 39. When Plaintiff pointed out that she approved the deadline, Beltz changed the review to "intimate" that Plaintiff had misrepresented the deadline. *Id.*

When Defendant shut down its in-person operations due to the COVID-19 pandemic, Plaintiff's interactions with Beltz were limited to bimonthly telephone calls and monthly group video conference meetings. *Id.* ¶ 40. Beltz was "often" late joining calls with Plaintiff and "regularly" appeared distracted or did something else like making lunch or eating. *Id.* Her attitude made Plaintiff feel "disrespected, and that [his] work was unimportant." *Id.*

"As a result of all of the above," Plaintiff's "work environment became joyless." *Id.* ¶ 41. He "consistently felt humiliated and undermined." *Id.* He suffered "humiliation, embarrassment, anger, eye spasms, loss of confidence, and some depression and sleep loss." *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the Court does not make credibility determinations, nor does it weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52. A genuine triable issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248; *see also McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (explaining that this is the inquiry at the summary judgment stage, "[s]tripped to its core"). Additionally, "all justifiable inferences" must be drawn in the non-movant's favor, *id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)), "only in the sense that, where the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the [summary judgment] motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Once the movant has made such a showing, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also Liberty Lobby, Inc.*, 477 U.S. at 252 (specifying that the non-movant "must show more than the mere existence of a scintilla of evidence"). The non-movant "bears the burden of production under [FRCP] 56 to 'designate specific facts showing that there is a genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "[A]ny dispute about the facts must be 'genuine' and not 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1124 (9th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986); *see also Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798, 805 (9th Cir. 2010) (affirming grant of summary judgment against appellant who had "failed to adduce any evidence or authority to support her claim").

### III.   DISCUSSION

#### A.   Preliminary Matter

Plaintiff requests to strike certain statements from the Svoboda Declaration (Dkt. No. 32) and the entirety of the Hoffman Declaration (Dkt. No. 33). Dkt. No. 39 at 13–16. Defendant concedes that "the evidence sought to be excluded is not necessary to rule" on its summary judgment motion and suggests instead that the Court "disregard such evidence *for purposes of this motion only* . . . ." Dkt. No. 40 at 10 (emphasis in original). The Court agrees that the contested statements are not material to resolution of the motion. Accordingly, the Court disregards the statements for purposes of the motion only.

#### B.   Retaliatory Demotion

Defendant argues that Plaintiff's retaliatory demotion claim is barred by the statute of limitations. Dkt. No. 30 at 7–8; Dkt. No. 40 at 3–6. Specifically, Defendant argues that "[Plaintiff's] reassignment was decided no later than March 20, 2019, and was final and communicated to [Plaintiff] on April 8, 2019 . . . ." Dkt. No. 30 at 8. In opposition, Plaintiff argues that the decision was not final and communicated to Plaintiff until April 18, 2019, when he was told the reassignment was no longer tentative. Dkt. No. 39 at 17–20.

A three-year statute of limitations applies to WLAD claims. *Antonius v. King Cnty.*, 103 P.3d 729, 732 (Wash. 2004) (en banc) (explaining that because WLAD does not contain its own limitations period, the general three-year statute of limitations for personal injury actions in RCW 4.16.080(2) applies). The three-year clock begins to run when the decision is final and

communicated to the employee, even if the effects of that decision are not felt until later. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980); *accord Albright v. State, Dep't of Soc. & Health Serv. Div. of Developmental Disabilities*, 829 P.2d 1114, 1116 (Wash. Ct. App. 1992) (adopting the *Ricks* standard for a WLAD claim, explaining that the statute of limitations did not accrue until a request for disability-related accommodation was "officially denied and communicated to [the plaintiff]").

Here, Defendant's decision to demote Plaintiff was not final until April 18, 2019. For all its briefing, Defendant does not dispute Plaintiff's sworn statement that on April 18, "[Svoboda] came into my office and told me the reassignment offer was no longer tentative and the reassignment would happen the following day." Dkt. No. 37 ¶ 31. As this Court explained in its Order on Defendant's Motion to Dismiss, "there would have been no reason to inform [Plaintiff] that the reassignment offer was no longer tentative on April 18, 2019, if the decision had been final before that date." Dkt. No. 35 at 6.

Additional facts support the conclusion that the demotion was not final until April 18:

- At the end of 2018, Plaintiff was still in his GP&T management role, even though Svoboda's 90-day deadline to find a new job had passed. *See* Dkt. No. 31 at 45 (84:16–18), 46–47 (85:20–86:2).

- On January 7, 2019, Svoboda told Hoffman that "HR is recommending we don't re-classify [Plaintiff] as a Level 5, at least at this time." Dkt. No. 38 at 22.

- In early March, Svoboda told Plaintiff that the new BIPLC director would decide what changes to make regarding Plaintiff and his team. Dkt. No. 37 ¶ 27.

- On April 3, Svoboda told Hoffman that they had to follow a process that included a "side by side comparison" of Plaintiff with another employee, which might have resulted in the reassignment of the other employee and not Plaintiff. *See* Dkt. No. 38 at 32.

ORDER ON MOTION FOR
SUMMARY JUDGMENT - 11

- On April 10 and (at least) April 12, Defendant's offer letters to Plaintiff stated in bold type that Plaintiff's reassignment was "contingent" on the satisfaction of certain requirements. *See* Dkt. No. 31 at 64, 66; *see also McConnell v. Gen. Tel. Co. of Cal.*, 814 F.2d 1311, 1317 (9th Cir. 1987) ("Although the letter may be sufficient to put an individual on notice as to *some* act of discrimination, it is far from clear that it was sufficient to give appellant notice of his actual termination.").

- On April 18, Svoboda informed other staff of Plaintiff's demotion. *See* Dkt. No. 32 at 52.

Defendant responds that Plaintiff was told on multiple prior occasions that he was going to be demoted. *See* Dkt. No. 40 at 3–5. Indeed, as Defendant points out, Plaintiff pleads these occasions in his FAC. *Id.*; *see* Dkt. No. 15 ¶¶ 30, 48–50, 53. But these prior occasions are, at best, expressions of an intent to demote Plaintiff, not the communication of a decision that was *actually* final. Unlike the binding Trustees' vote on tenure in *Ricks*, the demotion decision here was not binding and was apparently "contingent" until the very end. Defendant claims the follow-up letters were "simply administrative record-keeping." Dkt. No. 40 at 5. But even if the letters were simply "administrative," Defendant cannot get around the fact that it chose to include in the letters language specifically characterizing the reassignment as "contingent" on the satisfaction of certain requirements and, in addition, chose to emphasize the contingent nature by bolding that very sentence. *See* Dkt. No. 31 at 64, 66. Nor does Defendant provide any explanation for the fact that Svoboda did not inform other staff of Plaintiff's demotion until April 18. As this Court explained in its prior Order, "[Defendant] has not established a similar level of finality with respect to its decision to demote [Plaintiff] expressed by Svoboda on April 8, 2019." Dkt. No. 35 at 5. Even if Defendant *wished* to demote Plaintiff for some time and shared those wishes directly with him, such wishes do not trigger the statute of limitations until they are reality.

Accordingly, as to Plaintiff's retaliatory demotion claim, the Court DENIES the motion.

**C.     Retaliatory Hostile Work Environment**

Defendant argues that Plaintiff's allegations cannot constitute a hostile work environment as a matter of law because the terms and conditions of Plaintiff's employment were not sufficiently affected. Dkt. No. 30 at 8–11; Dkt. No. 40 at 8. As part of that argument, Defendant contends that allegations prior to the limitations period cannot be linked to allegations within the period such that they establish a continuing violation. Dkt. No. 30 at 11; Dkt. No. 40 at 7–8. In opposition, Plaintiff argues that all allegations can indeed be linked, and that they constitute sufficient evidence of a hostile work environment. Dkt. No. 39 at 20–24.

"A hostile work environment 'occurs over a series of days or perhaps years . . . . Such claims are based on the cumulative effects of individual acts.'" *Loeffelholz v Univ. of Wash.*, 285 P.3d 854, 857 (Wash. 2012) (en banc) (quoting *Antonius*, 103 P.3d at 734). An employer can be held liable for hostile work environment conduct occurring more than three years before the plaintiff filed suit (*i.e.*, before the "filing" or "limitations" period) if at least one act "contributing to the claim occurs within the filing period." *Antonius*, 103 P.3d at 734 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). In such a case, "the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability." *Id.* (quoting *Morgan*, 536 U.S. at 117). So, to determine whether a WLAD claim is timely based on a hostile work environment theory, the Court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Loeffelholz*, 285 P.3d at 858 (quoting *Antonius*, 103 P.3d at 737). While the discriminatory acts "must have some relationship to each other," "[t]he standard for linking discriminatory acts together in the hostile work environment context is not high." *Id.* at 859.

ORDER ON MOTION FOR
SUMMARY JUDGMENT - 13

     "Conduct that supports a hostile work environment claim must be so pervasive as to alter the terms and conditions of employment and create an abusive working environment." *Clarke v. State Att'y Gen.'s Off.*, 138 P.3d 144, 154 (Wash. Ct. App. 2006); *accord Loeffelholz*, 285 P.3d at 859 (quoting *Antonius*, 103 P.3d at 732); *Glasgow v. Ga.-Pac. Corp.*, 693 P.2d 708, 712 (Wash. 1985). "The conduct must be both objectively abusive and subjectively perceived as abusive by the victim." *Clarke*, 138 P.3d at 154. Courts applying Washington law to hostile work environment claims consider "the totality of the circumstances, including the frequency and severity of harassing conduct, whether it was physically threatening or humiliating, or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance." *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 619 (Wash. Ct. App. 2013) (citing *Washington v. Boeing Co.*, 19 P.3d 1041, 1046–47 (Wash. Ct. App. 2000)); *accord Loeffelholz*, 285 P.3d at 859 (holding that conduct underlying a hostile work environment claim is evaluated "with regard to the totality of the circumstances" (quoting *Antonius*, 103 P.3d at 732)). With regard to offensive comments, "[h]umiliation, emotional distress, absence from work, or 'friction' with other employees are sufficient to create an 'inference' that such reactions resulted from a hostile work environment." *Coles v. Kam-Way Transp.*, No. 75471–8–I, 2017 WL 3980563, at *5 (Wash. Ct. App. Sept. 11, 2017) (quoting *Davis v. W. One Auto Grp.*, 166 P.3d 807, 812 (Wash. Ct. App. 2007)).

     Here, construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the conduct experienced by Plaintiff was so pervasive as to alter the terms and conditions of his employment and create an abusive working environment.

     The three years prior to Plaintiff filing his lawsuit on April 15, 2022 (*see* Dkt. No. 1), are within the statute of limitations period. Plaintiff's demotion occurred after April 15, 2019, and as this Court explained in its prior Order, "that alone [suffices] to link the prior alleged

discriminatory acts into a single claim." Dkt. No. 35 at 8; *see Loeffelholz*, 285 P.3d at 859 (holding that the standard to link acts is "not high"). Notably, while Plaintiff's manager did change at the start of the limitations period, his new manager was not just *any* manager: It was Beltz, the very person about whom Plaintiff complained to Svoboda, the old manager, thus giving rise to Plaintiff's retaliation claim. *See* Dkt. No. 31 at 51–52 (90:21–91:20); *see also* Dkt. No. 38 at 41 (April 18 email from Beltz to Svoboda upon Plaintiff's acceptance of reassignment: "We will need to discuss next steps if you have time for a quick call today.").

Further, Defendant does not dispute that acts prior to April 15, 2019, were discriminatory; it argues only about the sufficiency of the post-April 15, 2019, allegations. *See* Dkt. No. 30 at 9–10. Those uncontested allegations include:

- He was not provided the training typically provided to someone in a new position. Dkt. No. 37 ¶ 33.

- He was required to comply with restrictions on remote work that applied to new, probationary employees. *Id.* ¶ 34.

- He was moved out of his office and assigned to a cubicle known by employees as "the Green Mile" because of the older workers who sat there. *Id.* ¶ 35.

- His supervisor pressured him to withdraw from long-time volunteer roles at the company, took away his volunteer budget when he refused, and involved the new BIPLC director in the pressure campaign. *Id.* ¶ 36. His supervisor demanded information about his volunteer mentor relationships. *Id.*

- He was "awarded" three "tokens for free ice cream" at the company cafeteria after completing a significant assignment. *Id.* ¶ 38.

- He was wrongly accused in a performance review of misrepresenting a work deadline. *Id.* ¶ 39.

- His supervisor was often late joining calls with him and appeared distracted or did something else like making lunch or eating. *Id.* ¶ 40.

This Court held in its prior Order that Plaintiff had "adequately alleged a hostile work environment that began before—and continued into—the limitations period." Dkt. No. 35 at 9. Now on summary judgment, the Court holds that (1) Plaintiff has presented evidence sufficient to raise a genuine issue of material fact as to whether he was subjected to a hostile work environment, and (2) a reasonable jury could conclude that these allegations are not "casual, isolated or trivial manifestations of a discriminatory environment," but rather the emblems of a sustained and deliberate campaign. *Glasgow*, 693 P.2d at 712; *see also Ray v. Henderson*, 217 F.3d 1234, 1245–46 (9th Cir. 2000) (reversing summary judgment for defendant on retaliatory hostile work environment claim where plaintiff experienced verbal abuse, pranks, false accusation of misconduct, and isolation by supervisors).

Accordingly, as to Plaintiff's retaliatory hostile work environment claim, the Court DENIES the motion.

### IV.   CONCLUSION

For the reasons above, the Court DENIES Defendant's Motion for Summary Judgment (Dkt. No. 30).

Dated this 8th day of August 2023.

Tana Lin
United States District Judge