1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

PAUL BERNAL,

12                              Plaintiff,

      v.

13

THE BOEING COMPANY,

14                              Defendant.

15

CASE NO. 2:22-cv-00533-TL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

16

17          This matter was tried before the Court without a jury from November 6 to November 9,

18   2023. The Court heard all the testimony at trial and has reviewed the admitted trial exhibits (Dkt.

19   No. 65), the Parties' briefing (Dkt. Nos. 50, 53, 67, 68), and the Parties' revised findings of fact

20   and conclusions of law (Dkt. Nos. 75, 76). The Court now makes the following findings of fact

21   and conclusions of law by a preponderance of the evidence, pursuant to Federal Rule of Civil

22   Procedure 52. The findings and conclusions below are based upon the Court's consideration of

23   all the admissible evidence and the Court's assessment of the credibility of the trial witnesses.

24

Any conclusion of law denominated as a finding of fact shall be deemed a conclusion of law, and any finding of fact denominated as a conclusion of law shall be deemed a finding of fact.

## I.   BACKGROUND

Plaintiff Paul Bernal ("Bernal") brought this action for damages under the Washington Law Against Discrimination ("WLAD"), RCW 49.60 *et seq.*, in King County Superior Court. Dkt. No. 1-1. Defendant removed the case to federal court. Dkt. No. 1. Bernal alleged that his employer, The Boeing Company ("Boeing"), retaliated against him after he reported to his former supervisor, Rick Svoboda, concerns regarding age discrimination of other workers by a colleague, Dr. Linda Beltz. In particular, Bernal asserts that as a result of raising the concern with Svoboda on July 19, 2018, Svoboda demoted him and subjected him to a hostile work environment, and that the hostile work environment continued when Svoboda assigned Bernal to work under Beltz.

## II.   FINDINGS OF FACT

**A.   The Parties**

1.   Plaintiff Paul Bernal is a resident and citizen of Washington.

2.   Defendant Boeing is a corporation organized and existing under the laws of Delaware. Boeing's headquarters and principal place of business are in Chicago, Illinois. Boeing is thus a citizen of Delaware and Illinois.

**B.   Bernal General Background**

3.   Bernal filed his complaint for damages in King County Superior Court on April 15, 2022.

4.   The claims in this case arise from Bernal's employment with Boeing in King County.

5.   Bernal graduated from college with a degree in finance.

6.   Bernal began working for Boeing in 1989, resigned to take a position at Microsoft in approximately 2000, returned to Boeing in January 2004, and has worked there since that time.

7. While employed at Boeing, Bernal obtained an MBA.

8. Bernal does not have a law degree.

9. In 2011, Bernal was promoted to an "M Level" Senior Manager position with Boeing Management Company ("BMC"). In his M-Level position, Bernal managed teams of specialists who licensed Boeing's intellectual property ("IP") to companies around the world. The M-Level manager position is the highest, non-executive management position at Boeing.

10. During his employment with Boeing, Plaintiff generally received positive performance reviews, pay increases, and bonuses. As a team leader, Bernal was recognized for giving his employees responsibility, holding them accountable, and motivating them. He worked very well with his small team of direct reports and had high employee engagement scores. However, since at least 2014, Svoboda consistently noted in the comments to Bernal's performance evaluations the following area for improvement: earn the trust of his other Intellectual Property Management ("IPM") colleagues outside of his team; be more open, honest, and transparent with them; and coordinate with them.

**C.** **Background of Bernal's Working Group within Boeing**

11. BMC, a wholly owned Boeing subsidiary, eventually became Boeing Intellectual Property Licensing Company ("BIPLC"). BMC and BIPLC were part of Boeing's IPM organization.

12. Beginning in 2013, Bernal reported to Rick Svoboda, the President of BIPLC, who, in turn, reported to Boeing Vice President Pete Hoffman, the head of IPM.

13. The head of BIPLC prior to Svoboda was known to be almost exclusively interested in making money through licensing Boeing's intellectual property without regard to whether other Boeing business units were being impacted or affected.

14. Hoffman was hired into his role with the understanding that he was to repair the substantially poor relationship between IPM and its internal clients at Boeing, especially with Boeing Commercial Airplanes ("BCA"). Hoffman hired Svoboda, who had a decades-long tenure in BCA sales and contract groups, to facilitate efforts to improve the poor relationship between BIPLC and BCA.

15. While working at BCA, Svoboda and his colleagues had found it frustrating to get licensing agreements out in a timely manner. When he began heading up BIPLC, he found a lack of urgency amongst the group's employees. For example, one employee had been working on a license deal for six months, and the last contact with the potential customer had been about a month or two prior to the conversation with Svoboda. When asked if the employee planned to visit the potential customer, the response was that an e-mail had been sent a couple months ago, and the employee was waiting to hear back.

16. Between 2013 to 2014, Svoboda reorganized BIPLC into three main groups of Licensing Specialists, with each group responsible for a specific licensing subject matter instead of territory. The new groups were: (1) Commercial Aerospace Licensing ("CAL"); (2) Defense IP Licensing; and (3) Global Patent and Technology ("GP&T"). Bernal managed GP&T, and Svoboda hired Dr. Linda Beltz in 2014 as an M-Level Senior Manager to manage CAL.

17. Bernal led the development of a business plan concept in which Boeing would explore opportunities to license its intellectual property to business outside of the aerospace sector (a project and work group that was known as Non-Core Licensing). Bernal believed he needed five to seven years to determine if the project would be successful, but he was told he would be given three or maybe four years. Svoboda noted in Bernal's

2013 performance review his "willingness to take on a risky new business challenge in a new arena for Boeing."

18.  Svoboda gave Beltz specific instructions to repair the group's previously poor relationship with BCA and to improve the professional attire and professionalism of the BIPLC group.

**D.  Complaints Received and Made by Bernal**

19.  Beginning in 2015, Bernal started to hear complaints from employees regarding the manner in which Beltz treated them. At least three employees on Beltz's team complained that she was subjecting some employees to unwarranted and heightened oversight and criticism in an unprofessional manner.

20.  The complaints continued into 2016. For example, Sam Wong told Bernal that he felt singled out in staff meetings for his written and verbal communication style and was concerned he would be written up, put on a performance improvement plan, or fired. Roger Freeman had discussions with Bernal about the treatment of older staff in their early to late fifties who were being treated poorly, surveilled more, and badgered about their dress. During that time, Bernal told Svoboda that it appeared Beltz was harassing and treating employees in an unprofessional and harsh manner.

21.  In 2017, Bernal had almost monthly conversations with employees on Beltz's team, in which they were complaining about her. For example: (1) Roger Freeman told Bernal that he was concerned that Beltz was harassing and targeting only older employees and was worried he would be next; (2) George Patzinsky told Bernal that he was constantly harassed about his dress and his appearance; and (3) Alexei Naimushin told Bernal he was asked by Beltz to target older employees for corrective action which made him uncomfortable.

22.   Beginning in 2017, Bernal told Svoboda that it appeared that Beltz was targeting her behavior at the older employees and that the frequency of the complaints was increasing. During the 2016 to 2017 period, Freeman also spoke with Svoboda on multiple occasions, sharing the same information provided to Bernal in the hopes he would rein Beltz in with regard to the older workers. Svoboda told both Bernal and Freeman to give him time and that he was working with Beltz. Svoboda told Bernal that Beltz was "only targeting the poor performers, the whiners, and the deadwood."

23.   In the first half of 2018, Bernal continued to be told by employees about concerns regarding the harassment of older employees by Beltz. Freeman told Bernal that none of the younger employees were held to the same scrutiny or surveillance as older employees. Jack Coe told Bernal he was worried about the oversight and surveillance to which he was subjected, including being harassed for leaving five minutes early although he had been in the office for ten hours on a certain day and for watching Boeing News Now videos on company time. Naimushin told Bernal that he was being asked to target and discipline older employees which was making him feel physically ill to the point where he might file a complaint.

24.   In early July 2018, Naimushin and other employees shared with Bernal that they planned on filing complaints regarding Beltz.

25.   Beltz hired Patzinsky and Wong.

26.   Beltz was also on the panel that interviewed Coe, who was sixty years old when he was hired. When Coe was hired, Beltz successfully nudged up his starting salary at his request.

27.   Bernal knew the ages of the individuals that complained to him because some were previously his employees, he knew when they graduated from college, or had talked

about their kids. He did not hear complaints of harassment directed at younger employees in their twenties or thirties.

28. Svoboda admitted hearing complaints about Beltz from Bernal and other employees and knowing that, generally, there were some concerns with how Beltz worked with others within BIPLC. Svoboda could not recall whether he received complaints from HR regarding Beltz's conduct. Svoboda recalled issues between Naimushin and Beltz but could not recall what the issues were. Svoboda also knew that Beltz had issues with other member of BIPLC from time to time but could not remember what the issues were. While Svoboda could not recall the specifics of the complaints, he denied ever hearing complaints of age discrimination while he was the Director of BIPLC.

29. Svoboda coached Beltz but claimed at trial he could not remember what he coached her about or the number of coaching sessions he held with her. Svoboda asserted that, generally, the focus of the coaching sessions was on how Beltz might improve her treatment of others and could deal with people "a little bit softer." For example, in a February 18, 2019, email in which Svoboda sent Hoffman his succession plan, he wrote that Beltz had "come a long way in working well with others, learning which fights to fight, etc," but that he still had a concern that "she still seems to rub some folks the wrong way."

30. Svoboda described Bernal's management style as more hands-off in that he let his people run with issues, whereas Beltz had a much more hands-on style that would drive her employees to execute.

31. Hoffman described Bernal as energetic, creative, and personable. He described Beltz as hard-driving and very focused with a sense of urgency in closing licensing deals.

32. On July 19, 2018, Svoboda told Bernal that he and his enforcement team would have to work closely with Beltz. This concerned Bernal because he and his team were older

1  employees, and he was concerned that they would be exposed to the same harassment

2  and targeting behavior he believed Beltz had engaged in with her own team.

3  33.  Bernal told Svoboda that if Beltz tried "any of her crap" with him or his team, as she had

4  done with hers, he would go straight to HR. Svoboda appeared angry, and instructed

5  Bernal, "You can't do that. You've got to talk to me, only me. You bring all complaints to

6  me. You never go to HR. You only come to me with your complaints." Bernal responded,

7  "Rick, I will be taking any issues directly to HR and I'll be informing you after the fact."

8  With that, Svoboda said something to the effect of "I guess we're done here."

9  34.  Svoboda did not recall this conversation during his testimony, but he could not state that

10  it did not occur. Svoboda also acknowledged that Bernal indicating that he would take

11  employee complaints to HR sounded like something Bernal would say.

12  35.  Bernal's comments impacted his relationship with Svoboda. Svoboda used to periodically

13  stop by Bernal's office on his way to the coffee station to chat. That stopped immediately

14  after their July 2018 conversation, and Svoboda instead took a route through the cubicles.

15  Any small chitchat stopped, and the only times Bernal and Svoboda communicated were

16  during meetings in which Svoboda was very direct with no small talk or pleasantries.

17  **E.     IPM 2018 Reorganization**

18  **1.     Bernal's Offer to Lead the Enforcement Team**

19  36.  Hoffman acknowledged that Bernal was given a difficult task with the Non-Core

20  Licensing project.

21  37.  By early 2018, Hoffman's immediate supervisor, Boeing Chief Engineer Greg Hyslop, told

22  Hoffman and Svoboda that he did not want Boeing engineers wasting their time on efforts

23  to license Boeing technology to third parties when it was much more important for those

24  engineers to focus on enforcement activities for Boeing's intellectual property. In addition,

it was difficult to license a technology without providing technology support, and Hyslop did not want to tap into Boeing engineering resources to solve other companies' problems or tax Boeing engineers with non-core work. Based on direction from Hyslop, Hoffman decided to shut down the Non-Core Licensing group and to reallocate resources to Hyslop's new priority, which was enforcement of Boeing's IP rights.

38.   In April 2018, Svoboda discussed with Hoffman making an organizational change by swapping Bernal's and Beltz's positions. Svoboda also discussed the switch with Freeman. This swap ultimately did not occur. At that time, Svoboda and Hoffman were aware that another IPM employee, Bob Nadalet, would be retiring and that BIPLC would need to absorb some of Nadalet's group's statement of work.

39.   In June 2018, the management team collaborated on how to reorganize BIPLC to incorporate the new work that was anticipated. That collaboration resulted in a stand-alone enforcement team and the GP&T team moving under the defense and technology team.

40.   The enforcement team had become a large priority for Hyslop, and as a result, there was a sense of urgency to get an enforcement team and manager of that team in place.

41.   At the end of June 2018, Svoboda asked Bernal if he would be interested in leading the new enforcement team. Svoboda informed Bernal that GP&T would be downsized or eliminated. At the time, Bernal believed he had the option of leading the CAL group or leading the enforcement group. Bernal told Svoboda he needed to think about the offer.

42.   Bernal again met with Svoboda after the Fourth of July holiday to discuss the enforcement team position. At the start of the conversation, Bernal still believed he had the option of keeping enforcement or taking CAL. During this meeting, Svoboda told Bernal that he was going to keep CAL with Beltz and needed Bernal to take over the enforcement team. Bernal told Svoboda that he wasn't excited about the position, but that

he would take it and give it 100 percent. When Svoboda told Bernal that he needed someone to give the position 120 percent and be passionate about it, Bernal told him "Rick, you don't need to keep selling me on it. I told you I'll take it. I will do it. I'll give it my 100 percent. And I will knock it out of the park."

43. In IPM organizational charts depicting changes, Bernal was consistently listed in the box matching the position of "Sr. Manager Enforcement."

44. In an email dated July 20, 2018, Beltz added Bernal as a collaborator for some requisition requests because "[h]e will become the manager for this role eventually."

45. On a July 20, 2018, call with all IPM team members, Hoffman announced that Bernal would be the incoming manager of the enforcement team.

46. Angela Smith was a mentee of Hoffman who worked in the same building. Hoffman knew Smith was looking for another opportunity and had been looking for a growth assignment for her. On August 2, 2018, Hoffman asked Smith whether she was interested in the enforcement management position, and she accepted the position on the same day.[1] Smith was in town in July 2018, except when she was on vacation in the last nine days of that month.

47. A workshop with the new enforcement team to define the group's statement of work, vision, and objectives occurred the first week of August 2018. Bernal helped design the workshop.

48. Smith did not officially transfer over to enforcement until August 17, 2018.

49. Hoffman and Svoboda claimed they started looking for another manager when Bernal turned down the enforcement position in June, or for a period of four to six weeks.

---

[1] In an email on May 29, 2019, Hoffman claimed that Smith approached him about the enforcement manager role. Ex. P-35 at 1.

50.   By July 2020, the entirety of the IPM group was moved to Boeing's law department. In this reorganization, Vice President Hoffman's position was surplussed despite having been a Boeing employee for 36 years. Hoffman was given a 60-day notice to either find a new position or accept a package that was offered by Boeing. Hoffman chose to accept the package and retire.

51.   The enforcement manager position that was offered to Bernal was changed to a director or executive position, with most of the directors in BIPLC now being licensed attorneys.

### 2.   Bernal's Removal from Enforcement and Return to GP&T

52.   In the early evening of August 2, 2018, Bernal received a call from Svoboda who informed Bernal that he would no longer be the enforcement team manager because Svoboda could not have a disgruntled manager leading that team. Svoboda stated no other reason for removing Bernal other than the claim he was disgruntled. Svoboda told Bernal that Smith would be replacing him.

53.   Svoboda also told Bernal during the call that: (a) Bernal would be temporarily getting his GP&T team back, he had 90 days to come up with three options for "rightsizing" that team, and the options would be presented to Hyslop; and (b) Bernal had 90 days, or until the end of the year, to find a new job outside of IPM or he would be demoted. Finally, Svoboda instructed Bernal that he was not to tell anyone that he had actually been removed from the enforcement position. Svoboda documented this call in an email to HR, and he agreed at trial that the email accurately sets forth the contents of the call. In that email, Svoboda agrees that during the call he told Bernal about a "shift in role" and "management change" that was happening: "we were moving him out of the Enforcement role and putting in Angela Smith." Svoboda claimed the management change was

1   happening because of Bernal's "displeasure" with the enforcement reorganization and his

2   "dis-interest in leading the new Enforcement organization."

3   54.   At a staff meeting after the enforcement workshop, Svoboda congratulated and thanked

4   everyone that participated in the workshop but did not specifically mention Bernal.

5   Bernal believed he should have been mentioned because he had pulled together the

6   agenda, the artifacts, and the participants, and had coordinated travel and food. He took

7   the omission as a slight and was embarrassed because some people in the meeting knew

8   he had done all the work for the workshop but had not been mentioned. Bernal felt that

9   Svoboda intentionally omitted his name to marginalize him and his efforts.

10   55.   Upon being given back his GP&T team, Bernal directed them on their usual work and on

11   developing the three GP&T options Svoboda claimed he needed for a later presentation

12   to Hyslop. Bernal and his team worked to develop the three GP&T options, and Svoboda

13   liked one of them. The purpose of the option exercise is unclear. While Svoboda claimed

14   the purpose was to bring an option to Hyslop, he admitted that he never did bring the

15   option to Hyslop.

16   56.   In October 2018, Bernal learned that Smith was leaving the enforcement position to take

17   another position. Bernal asked Svoboda to put him back in that role. Svoboda told Bernal

18   that his leadership was no longer wanted, that Svoboda wanted people who were

19   "drivers," like Beltz. In a joking, laughing manner, Svoboda told Bernal that he could

20   apply, and "we'll just see what happens." Defendant did not offer any evidence to refute

21   this testimony by Bernal. Bernal did not apply for the position because Svoboda's

22   response made him believe it would be futile, and he didn't want to suffer the further

23   embarrassment of not getting an interview for the position he had previously held.

24

57.     In the ensuing months, Svoboda discussed various options for Bernal with HR or Hoffman. Svoboda testified he was trying to help Bernal. For example, on October 5, 2018, Svoboda wrote to HR that he might have found Bernal a home managing a different group with the licensing team. By October 2018, Svoboda was getting advice from Boeing's legal department regarding Bernal even though Bernal had given no indication that he was going to take any legal action. On January 7, 2019, Svoboda informed Hoffman that HR recommended that Bernal not be re-classified as a Level 5 employee at that time. Svoboda proposed a plan to Hoffman that he had discussed with HR to retain Bernal as a manager. Hoffman raised an issue with having a manager without direct reports and a concern regarding how to keep Bernal motivated to find a new position. Ultimately, none of these alternatives came to fruition.

### 3.      Bernal's 2018 Performance Evaluation

58.     In December, Bernal received his 2018 performance review that contained performance priorities and targets that were previously agreed upon by Bernal and Svoboda.

59.     Bernal and Svoboda did not agree on the rating for each priority. Svoboda agreed to change the rating on one of the priorities (*i.e.* "Grow the Business") but he did not also change the overall rating in the "Priority Summary." Svoboda gave Bernal an overall rating of "Met" in the Priority Summary. This was the first time while supervised by Svoboda that Bernal had received a Priority Summary (previously called Business Goals and Objective) less than an "Exceeds."

60.     The overall rating is a factor utilized in determining an employee's individual performance score ("IPS") rating. The IPS rating is subsequently used to determine an employee's bonus.

61.     Bernal received an IPS rating in 2018 of .85; he had not previously received a rating below .95.

62.     The IPS rating was based on Bernal's performance and organizational impact as compared with the impact made by his IPM management peers. All managers within the organization must receive IPS ratings that average to a 1.0. So, for example, if one individual in the group gets a score of 1.1, then someone else has to get a score of 0.9. Hoffman's direct reports and possibly an HR person would talk about each one of the IPS ratings and the criteria and would settle on numbers to make sure that the IPS ratings averaged to 1.0.

F.      **Bernal's Reassignment to CAL**

        1.      **The Reassignment Process**

63.     On March 21, 2019, Svoboda was informed by HR that it would need to declare that the Bernal's position is affected by a surplus (as it is the position, and not necessarily Bernal himself, that is affected). HR would also need to conduct an assessment and a reduction-in-force mitigation review.

64.     Svoboda testified that in his mind, the decision to downgrade Bernal to a Level 5 employee became final at the end of March 2019. At that point, he was trying to make sure they were following all the proper procedures and policies established by the company as well as HR guidelines, as a downgrade was not something that happened every day.

65.     On April 3, 2019, at 7:12 p.m., Svoboda emailed Hoffman with information he received regarding the process that needed to be followed for any reassignment. That process included a "side by side comparison" of Bernal with another employee, after which "[t]he person with the lower rating" would receive "an offer to reclassify to a level 5" that Svoboda believed could happen by the coming Friday. However, later that day at 11:43 p.m., Svoboda received an email from HR in response to a conversation they had had, and which included an "Internal Employee Movement -- No-Post Intake" form with a

request date of April 3, 2019, listing Bernal as the employee who would be downgraded before the completion of the required side-by-side comparison process.

66.   On April 8, Svoboda told Bernal that he would be receiving a job offer for a Level 5 position working under Beltz, and that there would be a layoff package associated with the offer.

67.   On April 10, Bernal received a letter with a "reassignment offer" to a Level 5 position that reported to Svoboda, not Beltz. The letter also did not include a layoff package in the event Bernal rejected the job, but instead stated that if he did not accept the reassignment he would be terminated.

68.   On April 10, Svoboda requested a revised offer letter be sent to Bernal reflecting that he would be reporting to a senior manager and not a director (Svoboda). On April 12, Svoboda received an email informing him that the offer had been extended to Bernal.

69.   Bernal was provided with the new offer letter on April 15. This second offer letter was identical to the first offer letter except that it specified that Bernal would report to Beltz, not Svoboda. Both the April 10 and April 15 letters informed Bernal that due to a "surplus," he was being offered reassignment to a non-management position of IP Licensing Specialist. The letter also stated in bold lettering, "**Your assignment is contingent upon the following:** . . . ." The contingencies included "employee release requirements," which, if not met, would mean Bernal "may be ineligible to transfer and this offer will be null and void." Bernal was given three days to either accept the offer or resign. Svoboda never told Bernal that he had waived the eligibility requirements, or that Bernal could ignore parts of the reassignment letters he received.

70.   Bernal accepted the position within the required timeframe so that he would not be terminated.

71.   On April 18, Svoboda told Bernal, "We're definitely moving forward with the demotion. And you're to clean out your office and work with Linda. She has a couple of ideas on how to use you."

72.   Later that same day, Svoboda sent out an email to all of IPM announcing Bernal's demotion.

73.   Bernal continued managing the GP&T team as an M-Level manager until April 18, when he was downgraded to a Level 5 IP Licensing Specialist. Although he was downgraded, Bernal's salary remained the same as when he was an M-Level manager.

74.   From November 30, 2012, until April 19, 2019, Bernal was listed as an "IP Licensing Specialist Mgr M" in his Boeing Work History Report.

**2.      Working Under Beltz**

75.   Bernal wrote in his 2019 Annual Performance Review that "[m]y current supervisor [Beltz] is not privy to the underlying circumstances and details that preceded my being assigned to her team."

76.   Bernal testified that when he started back at CAL, he did not have any experience in the duties of a licensing specialist.

77.   Beltz assigned Bret McKenna, the acting lead at the time, to interface with Bernal. When hiring a person as a licensing specialist, Beltz would have them read the licensing handbook, refer to materials on the CAL server or Sharepoint system, and attend boot camps offered by Denise Steensland. Bernal was provided with the licensing handbook and materials about CAL on the server and Sharepoint. He was offered the boot camp the next time it would occur. Beltz also gave Bernal an on-the-job training assignment so he could learn the business.

78.   The on-the-job training assignment was to get the CAL standard licensing programs— and the data released under those programs—approved for release through a process

called Release of Boeing Proprietary Information ("RBPI"). Beltz wrote in Bernal's 2019 Annual Performance Evaluation that "Paul did not know much about the CAL Programs and he was assigned getting the CAL Standard Programs through the RBPI process by July 1 (he has Aug in his Workday system)." Bernal disputed that the assigned date for the RBPI Priority was July 1, commenting in his performance evaluation that it was actually August 1. Beltz listed the date in the section of Bernal's performance evaluation titled "Priority 4: Develop Tracking Mechanisms for Standard Programs RBPI's" as August 1, 2019, and gave him a rating of "Exceeded." She also commented that "overall, Paul did a really nice job with the RBPI assignment."

79.     Bernal testified that Beltz recognized his RBPI work at a staff meeting and then followed it up by giving him some ice cream tokens as "kudos for the work on RBPIs." This made him feel marginalized since ice cream tokens were for small accomplishments, and another individual had received IPM-wide recognition for getting a single RBPI done when he had gotten fourteen done. Beltz rarely recognized individual contributors but acknowledged having tokens managers could give out. She occasionally gave tokens to say 'thank you' or 'good job.' Beltz believed she gave Bernal three five-dollar cafeteria tokens. Beltz stated at trial that she never gave out ice cream tokens because she thought it was stupid to give ice cream.

80.     Boeing's telework policy for individual contributors allowed managers to grant, at their discretion, a request to work remotely one day per week. New employees were put on six-month probation during which they are not allowed to work remotely. When Bernal questioned why he was treated as a new employee and asked Beltz to reconsider, she spoke with Svoboda who said they could reassess the situation in July. Beltz also told him they needed to wait for Bernal to learn his role a little more since he was not familiar

with CAL, and she felt he needed to be in the office around other resources. The situation was reassessed, and Bernal was allowed to begin working remotely approximately two months after he joined the group.

81. Beltz requested Bernal to reduce his diversity, equity, and inclusion ("DEI") activities and to make some choices about what he was going to do because he needed to learn his new role. Bernal's 2019 performance evaluation listed that he was: (1) a co-sponsor of Boeing Resource Group and Boeing Native American Network ("BNAN"), including a November Native American Heritage Month event; (2) was a senior advisor for Boeing Women in Leadership ("BWIL") until August 2019; (3) attended the American Indian Science of Engineers Society Annual Meeting in October 2019; (4) participated in Northwest Harvest Boeing Volunteer event; and (5) was mentoring multiple members of BWIL, Boeing Asian Professionals Association ("BAPA"), and BNAN. Beltz gave Bernal a rating of "Exceeded" for "Priority 3: Lean/Continuous Improvement/Volunteerism/Diversity."

82. Becoming a licensing specialist required Bernal to give up his office and move into a cubicle. All licensing specialists for CAL work in cubicles. One set of cubicles were along the window, and there was a cubicle on the end in that row where the occupant would have a neighbor on only one side. Beltz assigned Bernal the cubicle along the window with only one neighbor. Prior to Bernal, the occupant of the cubicle was Cory Hill, Bernal's current boss and the current leader of CAL.

83. Beltz requested that all her employees—and her supervisors—allow her to see their calendars, and she let them see hers to make it easier to schedule meetings. If an appointment was private, the item could be marked private. Beltz testified that if the calendar just showed as busy, then one would not know if the time could be booked over.

For example, one would not know if it was on hold to work on a project or for a one-on-one meeting, which is typically more flexible than a team meeting. That was her stated purpose for increasing the visibility of employee calendars.

84. During COVID, Beltz was working from her kitchen table when holding remote one-on-one meetings with people on her team. It was routine for her to eat during meetings because she did not schedule lunches. Beltz testified that she intended no disrespect to Bernal by eating during their one-on-one meetings. No evidence was provided as to whether Beltz ate while in meetings with employees other than Bernal.

85. Bernal received 75 shares of stock from Boeing in 2020 but believes he would have received 100 shares had he been an M-Level manager. Management would receive 100 shares while non-management received 75 shares.

86. Bernal is the highest-paid Level 5 IP Licensing Specialist. He receives a base salary of approximately $211,000 per year. The mid-range base salary for his level in Tukwila, Washington, is $174,000 per year. Bernal's salary is roughly at a 1.22 compa-ratio with respect to his peers. The next highest-paid Level 5 IP Licensing Specialist receives a base salary at a .99 compa-ratio, or a little less than $174,000 per year. Although Bernal is not an attorney and does not hold a law degree, two of the three specialists in his level are licensed attorneys, and Bernal's supervisor is an attorney seeking his license.

**G.    Effect on Bernal**

87. Emotionally, Bernal felt underutilized, marginalized, demeaned, and oppressed within his workplace. This caused Bernal to feel hopeless at times. Bernal testified that he was made to feel like an outcast, a leper. When he would see people that he used to work with as peers, or had relationships with, they would try to avoid him or divert their eyes, leading

him to believe they didn't want to interact with or be around him. Bernal continues to question his self-worth and abilities.

88. His family and social life has also been impacted. Bernal felt betrayed by Boeing and had his identity crushed, resulting in his becoming more reclusive. He has less interest in doing things with family and friends, and instead finds himself wanting to stay home.

89. Bernal has suffered from stomach issues and acid reflux, at some point experienced heart palpitations and chest pains, and had developed an eye twitch. In addition, he testified that he has also experienced chronic fatigue.

90. Bernal's wife, Jamie Harker, described Bernal as being distraught immediately following his call with Svoboda on August 2, 2018, and that since that time he is no longer the same person. Harker also testified that after the August 2 call, she observed that Bernal developed sleep problems, stomach issues, and experienced chest pains and heart palpitations. Currently, Bernal does not experience the chest pains as frequently, and his acute anxiety symptoms have improved. However, he still goes through anxiety-type symptoms that wax and wane, and he appears depressed in that he constantly complains about exhaustion, fatigue, and the sense of being drained. Harker further testified to noticing that Bernal became quieter at home, withdrawn, and less social with family and friends. Harker believes that Bernal continues to experience anxiety, which he tries to manage with meditation. He continues to experience insomnia. Bernal is not the same person he was prior to the demotion.

**H. Boeing's Finances in 2020 Forward**

91. Boeing maintains an incentive compensation plan that is based on the company's performance, the business's performance, and the employee's performance.

92. In 2019, a fraction of the bonuses provided in the incentive compensation plan were provided.

93. In 2020, Boeing was in difficult financial straits due to the grounding of its Max airplanes and the COVID-19 pandemic. Hoffman's position was surplussed to save costs.

94. Bernal testified that no bonuses were awarded in 2020, and stock was issued in lieu of the cash bonuses. Bernal also admitted that he did not know if bonuses would be distributed in the coming year.

95. Multiple witnesses stated that there was no guarantee of a bonus and that they had no idea what bonuses or incentive payments, if any, would be awarded.

### III.   CONCLUSIONS OF LAW

Pursuant to the foregoing Findings of Fact, the Court concludes as follows:

**A.   Jurisdiction and Venue**

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391(b)(2).

**B.   Plaintiff's Claim**

2. Plaintiff alleges that Boeing retaliated against him in violation of the Washington Law against Discrimination, RCW 49.60 *et. seq.*

**C.   Standard of Proof**

3. Plaintiff must prove his claim by a preponderance of the evidence. "The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true." *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005).

**D.   Legal Standard**

4. "It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." RCW 49.60.210(1).

5.   To establish a *prima facie* case of retaliation under RCW 49.60.210, a plaintiff must show: (1) the employee took a statutorily protected action; (2) the employee suffered an adverse employment action; and (3) a causal link between the employee's protected activity and the adverse employment action. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018).

6.   RCW 49.60.210(1) protects an employee who reasonably believes he or she is opposing discriminatory practices, whether or not the practice is actually discriminatory, or who complains about the treatment of others. *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 743, 745, 332 P.3d 1006 (2014); *see also Estevez v. Fac. Club of Univ. of Wash.*, 129 Wn. App. 774, 798, 120 P.3d 579 (2005) (holding that a plaintiff "need only prove that her complaints went to conduct that was at least arguably a violation of the law, not that her opposition activity was to behavior that would actually violate the law against discrimination"). The reasonableness of a plaintiff's belief is an objective standard. *Id*. at 745.

7.   "An employee proves causation 'by showing that retaliation was a substantial factor motivating the adverse employment decision.'" *Cornwell*, 192 Wn.2d at 412 (quoting *Allison v. Hous. Auth.*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991)).

8.   If the plaintiff establishes a *prima facie* case, then the defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action. *Currier*, 182 Wn. App. at 743. This shifts the burden back to the plaintiff to prove that the defendant's reason is pretextual. *Id.* "The trier of fact must then 'choose between inferences when the record contains reasonable but competing inferences of both discriminatory and nondiscriminatory actions.'" *Id.* (quoting *Burchfiel v. Boeing Corp.*, 149 Wn. App. 468, 483, 205 P.3d 145 (2009)).

9.    "To show retaliation based on protected activity, a plaintiff must provide evidence that the individuals he alleges retaliated against him knew of his protected activity." *Marin v. King Cnty.*, 194 Wn. App. 795, 818, 378 P.3d 203 (2016) (citing *Currier*, 182 Wn. App. at 746–47).

10.   Harassment is actionable only if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted). It must be both objectively and subjectively offensive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). To determine whether an environment is sufficiently hostile, a court looks to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 787–88 (quoting *Harris*, 510 U.S. at 23).

11.   A three-year statute of limitations applies to WLAD claims. *Antonius v. King Cnty.*, 153 Wn.2d 256, 261–62, 103 P.3d 729 (2004) (explaining that because WLAD does not contain its own limitations period, the general three-year statute of limitations for personal injury actions in RCW 4.16.080(2) applies).

**E.    Statute of Limitations**

12.   The three-year clock on the statute of limitations for a WLAD claim begins to run when the decision is final and communicated to the employee, even if the effects of that decision are not felt until later. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980). The decision must be "officially [made] and communicated to [the plaintiff]" for the statute of limitation to begin to accrue. *See Albright v. State, Dep't of Soc. & Health Servs. Div. of Developmental Disabilities*, 65 Wn. App. 763, 767, 829 P.2d 1114 (1992) (adopting the *Ricks* standard for a WLAD claim and explaining that the statute of limitations did not

1    accrue until a request for disability-related accommodation was "officially denied and

2    communicated to [the plaintiff]").

3    13.   Svoboda initially verbally informed Bernal that he would not receive the Enforcement

4          Manager position on August 2, 2018, and would have until the end of 2018 to find a new

5          position or be demoted. However, Svoboda continued to try to find a position for Bernal

6          as late as January 7, 2019, and HR was recommending Bernal not be downgraded at that

7          time. Svoboda further admitted that the decision to downgrade Bernal to a Level 5

8          became final in his mind at the end of March 2019.

9    14.   The evidence also established that there was an official process that needed to occur

10         before Bernal could be downgraded to a Level 5 employee, and that process did not even

11         begin until sometime in early April 2019.

12   15.   While Bernal received a written letter on April 10, 2019, informing him of his

13         reassignment to a Level 5 position, the letter stated in bold lettering "**Your assignment is**

14         **contingent upon the following:** . . . ." The contingencies included "employee release

15         requirements," which, if not met, would mean Plaintiff "may be ineligible to transfer and

16         this offer will be null and void." On that same day, Svoboda requested that requested a

17         revised offer letter be sent to Bernal reflecting that he would be reporting to a senior

18         manager and not a director. Bernal received the revised letter on April 15, 2019, and that

19         letter contained the same bolded language regarding contingencies as the April 10 letter.

20         The April 15 letter gave Bernal three days to accept the reassignment, which he did on

21         April 17, 2019. Boeing cannot get around the fact that it chose to include in the letters

22         language specifically characterizing the reassignment as "contingent" on the satisfaction

23         of certain requirements and, in addition, chose to emphasize its contingent nature by

24         bolding that very sentence.

16.     Svoboda sent out an announcement regarding Bernal's reassignment on April 18, 2019. As this Court explained in its Order on Boeing's Motion to Dismiss, "there would have been no reason to inform [Plaintiff] that the reassignment offer was no longer tentative on April 18, 2019, if the decision had been final before that date." Dkt. No. 35 at 6.

17.     The evidence at trial showed that while there were prior occasions of an intent to demote Bernal, the decision was not final until April 18, 2019. Therefore, the Court holds that Plaintiff's claim is not time barred.

**F.**     **Retaliatory Demotion and Hostile Work Environment by Svoboda**

18.     While Bernal initially relayed to Svoboda more general complaints about Beltz, he became more specific beginning in 2017, telling Svoboda that it appeared that Beltz was targeting her behavior at the older employees. On July 19, 2018, Bernal had another conversation with Svoboda and voiced concerns about harassment of older employees by Beltz. This occasion was different than the others because for the first time, Bernal stated he would take action by going straight to HR if Beltz tried anything with him or his team, which seemed to anger Svoboda (unlike on prior occasions when discussions regarding Beltz had occurred). While Svoboda did not recall this conversation while testifying, he could not state that it did not occur and also acknowledged that Bernal indicating he would take employee complaints to HR sounded like something Bernal would say. Svoboda testified that he did not remember ever hearing complaints from employees of age discrimination by Beltz, but Bernal and Freeman testified that they discussed Beltz's treatment of older workers on multiple occasions with Svoboda. Svoboda did admit that he heard enough general complaints that he had to coach Beltz on more than one occasion. Yet, Svoboda could not remember what coaching he provided Beltz. From

1    observing the witnesses, the Court credits Bernal's version of the July 19, 2018, meeting

2    over Svoboda's selective memory of the events during the relevant time period.

3    19.   From observing Bernal's and Beltz's demeanors at trial, they were two very different

4          personalities. The Court credits the testimony regarding their different management styles

5          (*i.e.*, Bernal was more hands-off and personable while Beltz was more hands-on, hard-

6          driving, and focused). The Court does not comment on the strengths and weaknesses of

7          each style or whether Beltz's style may have been misinterpreted as being harder on older

8          employees. The Court finds a tension exists between the complaints of age discrimination

9          by Beltz and the fact that: (a) she hired some of the employees who were complaining of

10         the age discrimination; (b) they were comfortably in the protected age range when she

11         hired them; and (3) she even negotiated a higher starting salary for one of them (Coe).

12         However, the Court finds that given the complaints and specific information Bernal

13         received, he reasonably believed that Beltz may have been targeting older employees,

14         even if there is a possibility that Beltz's actions were not actually discriminatory. *See*

15         *Currier*, 182 Wn. App. at 743. While Bernal did not strictly follow the Boeing policy

16         regarding reporting acts of discrimination, others told him they would be reporting it, and

17         he reported the behavior multiple times to his supervisor (Svoboda), who told him (and

18         others) that he was working on the issue.

19   20.   Therefore, the Court finds that Bernal took a statutorily protected action. The Court also

20         finds that within weeks of his complaint to Svoboda, Bernal was removed from the

21         Enforcement Manager position, was discouraged from applying for the position when it

22         became open again, and eventually was demoted to a Level 5 non-management position

23         which supports an inference that the protected activity caused the adverse action.

24

Therefore, Bernal met the requirements to establish a *prima facie* case of retaliation by a preponderance of the evidence.

21.   The only reason Boeing offered in response was that Bernal was unenthusiastic about the Enforcement Manager position. The Court credits this as a legitimate, nondiscriminatory reason for not wanting to give Bernal the job. This shifts the burden back to Bernal to establish that the reason given is pretextual.

22.   The Court finds that the "enthusiasm" defense is pretextual. Svoboda knew that Bernal was not fully enthusiastic about the position since at least June 2018. Svoboda and Bernal had yet another discussion about Bernal's enthusiasm (or lack of it) for the position shortly after July 4, 2018. Svoboda and Hoffman also knew that the enforcement function had become a very high and urgent priority for Boeing and that Hoffman's mentee, Angela Smith, was openly looking for another opportunity. Hoffman even testified that he had been looking for a growth assignment for her. Yet, neither Hoffman nor Svoboda sought out Smith for the position until August 2, 2018, after Bernal's complaint and just days before an important planning workshop for the Enforcement Group. In fact, the offer to Smith went to her so late that she did not officially begin in the position until after the workshop had taken place. Bernal also provided testimony that others, including Beltz, believed that Bernal was going to be the Enforcement Manager. Documents from that time period, including an email from Beltz, confirm the testimony.

23.   Boeing asserts that the organizational charts had Bernal's "name [ ] placed, *without a job title*, in an org-chart box entitled Enforcement." Dkt. No. 75 ¶ 18 (emphasis in original). Yet, a comparison of two organizational charts depicts an exact match for the box with "Sr. Manager Enforcement" with the box labeled "Paul Bernal Enforcement." *Compare* Ex. P-24 at 7, *with id.* at 9. The Court also notes that in the final organizational chart, the

senior managers of each team are listed without job titles. *See* Ex. P-34 at 4. Boeing also tried to make much of the fact that the enforcement manager position was not listed on Bernal's Work History Report. However, even when Bernal became the manager of GP&T, no change in his position was noted in his Work History Report as he remained in the same job category of "IP Licensing Specialist Mgr M." In other words, there was no notation that Bernal specifically became the GP&T Manager versus remaining an M Level manager in IPM. Therefore, the fact that the organizational charts did not list a title for Bernal, or that Bernal's Work History Report did not reflect his becoming Enforcement Manager, carry no weight with the Court.

24.     There is some evidence that after removing Bernal from the Enforcement Manager position, Svoboda made efforts to find another position for Bernal. Giving the most generous interpretation, Svoboda's actions reflect what efforts one might make to help an employee for whom there is at least some residual good feeling. However, an equally viable inference is that when one consults with legal, they may be attempting to assuage employer concerns that an action could be seen as unlawful. The Court credits Svoboda's testimony that he was trying to help Bernal, but only to a limited extent. Given the totality of the circumstances in this case—including Svoboda's admission that Bernal had given no indication that he would take legal action at the time the legal department was consulted, the fact that Svoboda had Bernal develop options for GP&T to present to Hyslop but never brought those options to Hyslop, and the fact that Svoboda already discussed with and had HR prepare papers downgrading Bernal before completing the side-by-side comparison required before reassignments—the Court finds the inference ultimately weighs in favor of Bernal.

25.     Therefore, the Court finds Bernal established by a preponderance of the evidence that

Svoboda removed him from the Enforcement Manager position and eventually demoted

him to a non-managerial position in retaliation for engaging in protected activity in

violation of RCW 49.60.210. As Svoboda was a manager and personally participated in

the retaliatory action, the unlawful behavior is imputed to his employer, Boeing. *See*

*Alonso v. Qwest Commc'ns. Co.*, 178 Wn. App. 734, 752, 315 P.2d 610 (2013) (citing

*Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 407, 693 P.3d 708 (1985)).

26.     Bernal also asserts that Svoboda retaliated against him by giving him a poor performance

evaluation and IPS score at his 2018 performance review. However, Boeing offered a

legitimate, non-discriminatory explanation for his evaluation and score. Bernal, on the

other hand, offered no evidence as to how his performance and organizational impact

compared with the performance and organizational impact of other IPM managers with

whom he was being compared. Therefore, the Court finds Bernal did not meet his burden

of proof with regard to this allegation.

**G.     Retaliatory Hostile Work Environment by Beltz**

27.     Bernal's own testimony was that Beltz did not know why he was transferred to her. If she

had no knowledge of his discrimination complaints, then she could not have retaliated

against him. *See Marin*, 194 Wn. App. at 818. This fact alone is enough to doom his

retaliation claim against Beltz.

28.     Even considering the examples that Bernal alleges created a hostile work environment by

Beltz, the Court finds that Boeing provided a legitimate, nondiscriminatory reason for

each. For example, Bernal acknowledged needing training but then also wanted to be

treated as a seasoned, non-probationary employee with regard to remote work. He cannot

have it both ways. And in any event, in that instance, he was allowed to work remotely

after just two months, not the full six months usually required of probationary employees.

Bernal alleged he was provided no training on the duties of his new position, but the

evidence showed that he was provided a lead contact, the training materials available to

all CAL employees, and an on-the job training assignment. He was assigned a cubicle

instead of an office, but all licensing specialists were assigned cubicles. Further, he was

assigned a more desirable cubicle by the window and on the corner so he would have one

less neighbor. Bernal also felt disregarded by being rewarded with ice cream tokens.

There was a dispute as to whether he was given ice cream tokens or cafetoria tokens.

Regardless, the Court finds that Beltz rewarded her employees in a different manner than

Bernal would, and while the Court can understand why Bernal might have taken offense

to being awarded tokens of any kind as a "reward," the Court does not find that incident

constitutes created a hostile work environment. Ultimately, Bernal did not meet his burden

to demonstrate any of the non-discriminatory reasons provided by Boeing were pretextual.[2]

**H.    Economic Damages**

29.    Plaintiff may recover for economic damages caused by the retaliatory demotion and

downgrade to a non-management position. Bernal testified that he plans to work for

Boeing until at least age 65.[3] He asserts that in 2020, he would have received 25 more

shares of stock had he remained in his M-Level management position. He also alleges

that he would have received additional bonus payments in 2022 had he remained in his

M-Level position.

---

[2] There was an allegation that Beltz made one comment to Bernal about the "crying chair" where older workers would sit to talk about what was happening to them and would often be reduced to tears. The existence of the "crying chair" was never raised until trial. In any event, even assuming the truth of this allegation, the single comment would not suffice to establish a hostile working environment.

[3] He also asserted he received a lower bonus in 2018 due to his IPS rating, but the Court has found that he did not prove by a preponderance of the evidence that the IPS rating was retaliatory.

30.   However, things were always changing in an organization like Boeing, as evidenced by Svoboda's reorganization of BIPLC in the 2013 to 2014 time period and by the reorganization of IPM that resulted in Hoffman's position being surplussed. It is undisputed that: (1) by July 2020, the entirety of the IPM group was moved to Boeing's law department; (2) most of the current managers in BIPLC are licensed attorneys; and (3) Bernal is the only non-attorney in his current tier of licensing specialists.

31.   Therefore, while Bernal is entitled to economic damages, he has not proven by a preponderance of the evidence that he is due any amount of money for economic damages. First, the preponderance of the evidence showed that Bernal likely would have lost the M-Level Enforcement Manager position by 2020 since the whole IPM department was moved to the law department, and he is not a lawyer. Even Hoffman, with nearly forty years with Boeing, was surplussed in this reorganization. Second, his pay upon demotion remained the same as when he was a M-Level manager, and he has continued receiving raises. Third, Boeing's financial health was impacted by the grounding of its Max airplanes and the COVID-19 pandemic, and no bonuses were given in 2020. As the Court finds that Bernal has not proven that he would have been in a managerial position in 2020 or further into 2022, he has not proven that he would have received an extra 25 shares of stock in 2020 or additional bonuses in 2022. Further, given the paucity of evidence supporting economic damages, it would be pure speculation on the Court's part to attempt to determine future bonuses or other economic damages that might be paid under the facts presented in this case. As a result, the Court awards $0 in economic damages.

**I.      Non-Economic Damages**

32.     Non-economic damages include damages for emotional harm such as emotional distress,

loss of enjoyment of life, humiliation, pain and suffering, personal indignity,

embarrassment, and anxiety. *See* Wash. Pattern Jury Instructions – Civil ("WPI") 330.81

(7th ed.). Non-economic damages do not need to be proven with mathematical certainty

and need only be supported by competent evidence. *See, e.g.*, *Pendergrast v. Matichuk*,

189 Wn. App. 854, 867–72, 355 P.3d 1210, *aff'd*, 186 Wn.2d 556, 379 P.3d 96 (2015)

(affirming non-economic damages award despite lack of supporting testimony from

healthcare professionals or lay witnesses other than plaintiff about her anxiety and

distress). Subjective testimony of the plaintiff, corroborated by others (including

relatives), may be sufficient. *See Passantino v. Johnson & Johnson Consumer Prods.*,

212 F.3d 493, 513–14 (9th Cir. 2000). In addition, "Washington law contains no severity

requirement as a precondition to awarding compensatory damages . . . ." *Id.* at 513; *see*

*also Hill v. GTE Directories Sales Corp.,* 71 Wn. App. 132, 139–40, 856 P.2d 746 (1993)

(holding plaintiff not required to prove her stress was severe) (citing *Nord v. Shoreline*

*Sav. Ass'n*, 116 Wn.2d 477, 483–85, 805 P.2d 800 (1991)).

33.     Bernal seeks "garden variety" non-economic damages for non-medical emotional

distress. "'Garden variety' emotional distress is 'ordinary or commonplace emotional

distress, that which is simple or usual.'" *Rollins v. Traylor Bros. Inc.*, No. C14-1414,

2017 WL 1756576, at *6 (W.D. Wash. May 5, 2017) (quoting *Carrig v. Kellogg USA*

*Inc.*, No. C12-837, 2013 WL 392715, at *3 (W.D. Wash. Jan. 30, 2013)).

34.     The Court finds that as a result of having the Enforcement Manager position taken away

from him and the subsequent demotion to a non-managerial position, Bernal suffered

humiliation, embarrassment, anxiety, sleep issues, and self-esteem issues. The Court also

credits Bernal's and his wife's testimony that he withdrew from family and friends and developed sleep problems, stomach issues, an eye twitch,[4] exhaustion, and fatigue. He experienced chest pains and heart palpitations, which seem to have improved, but he still experiences the other effects of the retaliation. However, the Court also considers that Bernal retained the same salary once he was demoted (and is by far the highest paid Licensing Specialist) and would likely have lost the Enforcement Manager position within two years of receiving it (or by July 2020).

35. The Court has reviewed the Parties' briefing on non-economic damages. Dkt. Nos. 67, 68.

36. Having considered the evidence, the Parties' arguments, and awards in other cases, the Court concludes that Bernal is entitled to non-economic damages in the amount of $75,000.00.

## IV.    ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, the Court ENTERS the following Order:

Plaintiff Paul Bernal is entitled to a judgment against Defendant The Boeing Company as follows:

1.    Economic Damages: $0

2.    Non-Economic Damages: $75,000.00

Dated this 22nd day of January 2024.

Tana Lin
United States District Judge

---

[4] A Boeing witness testified that she did not observe Bernal's eye twitch at work, but Bernal did not testify that his eye always twitched. So, it is not surprising that it may or may not have been observed by a colleague, depending on the frequency of the person's interaction with Bernal.